ORIGINAL

1  Laurence M. Rosen, Esq. (SBN 219683)
2  THE ROSEN LAW FIRM, P.A.
   333 South Grand Avenue, 25th Floor
3  Los Angeles, CA 90071
4  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
5  Email: lrosen@rosenlegal.com

6  Lead Counsel for Lead Plaintiffs

7              UNITED STATES DISTRICT COURT
8             CENTRAL DISTRICT OF CALIFORNIA
                   SOUTHERN DIVISION
9

10

| 11 | VINH NGUYEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CASE No.: CV-11-0406-DOC (MLGx) |
|---|---|---|
| 12 | | |
| 13 | Plaintiff, | CLASS ACTION |
| 14 | v. | AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| 15 | RADIENT PHARMACEUTICALS CORPORATION, DOUGLAS C. MACLELLAN, and AKIO ARIURA, | |
| 16 | | |
| 17 | Defendants. | JURY TRIAL DEMANDED |

BY FAX

19        Lead Plaintiffs Reydel Quintana, Dat Tan Tran, and Agnes Cho, individually

20  and on behalf of all other persons similarly situated, by their undersigned attorneys,

21  allege in this Amended Complaint (the "Complaint") the following upon

22  knowledge with respect to their own acts, and upon facts obtained through an

23  investigation conducted by their counsel, which included, *inter alia*: (a) review and

24  analysis of relevant filings made by Radient Pharmaceuticals Corporation

25  ("Radient" or the "Company") with the United States Securities and Exchange

26  Commission (the "SEC"); (b) review and analysis of defendants' public documents,

27  conference calls and press releases; (c) review and analysis of securities analysts'

28  reports and advisories concerning the Company; (d) information readily obtainable

on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased the common stock of Radient during the period January 18, 2011 through March 4, 2011, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2.     Radient is small pharmaceutical company whose main business is the research, development, manufacturing and sale of an In-Vitro Diagnostic Cancer Test, called Onko-Sure. Onko-Sure is a non-invasive blood test used to detect cancer.   Onko-Sure is Radient's main product and central to its business and operations.

3.     Onko-Sure was deemed a medical device or a biologic by the U.S. Food and Drug Administration ("FDA"), and was approved to be marketed in the U.S. market for use in monitoring patients who have previously been diagnosed with colorectal cancer. Onko-Sure has had to compete with the industry standard test, the Carcinoembryonic Antigen marker test (CEA), since at least the early 1980s.

4.     Radient's efforts to market and convince medical practitioners and institutions to utilize Onko-Sure instead of the CEA test and other competing tests has been a slow and expensive process.  Immediately before, during and after the Class Period, the Company's auditor had issued a "going concern" qualification in its audit opinion for the Company noting that there was substantial doubt as to

Radient's ability to continue as a going concern, due to significant operating losses incurred by the Company, negative cash flows, and accumulated deficits.

5.     Radient's reported revenue for the fiscal year ended December 31, 2010 was a mere $231,662. Its operating expenses were over $14.0 million and its net loss for the 2010 fiscal year was $(85,711,853).

6.     Radient acknowledged in its SEC filings that that its ability to continue operations depended on raising additional capital.

7.     Radient had long funded operations through offering of debt and securities, including among others, (a) September 2008 Convertible Note Financing for $2.51 million proceeds; (b) September 2009 Bridge Loan for $58,000; (c) December 2008 Senior Note Financing for $856,714; (d) January 30, 2009 Senior Note Financing for $566,600; (e) May 4, 2009 Senior Note Financing for $1.1 million; (f) June 12, 2009 Senior Note Financing for $396,296; (g) March 2010 12% Convertible Note Financing for $540,000; (h) April 8, 2010 12% Convertible Note Financing for $3,225,000; (i) April 13, 2010 12% Convertible Note Financing for $2,310,000; and (j) April 26, 2010 12% Convertible Note Financing for $400,000. The above financings were all convertible in one form or another to the Company's common stock.

8.     Throughout 2010 the Company also paid for a number of services using the Company's common stock.

9.     In short, during the time leading up the Class Period, Radient was desperate for operating cash and resorted to every form of available financing it could obtain to funds its operations.

10.     By the time of the start of the Class Period on January 18, 2011, the spigot of capital from investors was running dry, and the Company was running out of funds.

11.     Radient was also engaged in litigation with certain of its investors for either being in default or breach of the financing obligations.

(a)     On June 11, 2010 Hudson Bay Fund, L.P. sued Radient in connection with its purchase of April 8, 2011 Convertible Promissory Notes alleging Radient's breach of certain Triggering Events; and

(b)     On December 21, 2010, Whalehaven Capital and Alpha Capital Anstalt jointly commenced a lawsuit against Radient, for failing to increase the number of shares covered by the warrants issued to those entities as a result of Radient's decreasing stock price, and for Radient's failure to obtain shareholder approval for the issuance of shares that Radient was obligated to issue to the plaintiffs in that action in connection with a November 2009 financing.

(c)     In short, as Radient's stock price declined, its financing costs increased, including its ongoing obligations to pay interest and issue additional stock to existing investors.  This created intense pressure for Radient to stabilize its stock price and prevent any further stock price declines.

12.     Against this backdrop, on January 18, 2011 Defendants issued materially false and misleading press release stating that Radient and the prestigious Mayo Clinic together were conducting a clinical trial for Onko-Sure and that the Mayo Clinic and Radient were to provide clinical study results. The Mayo Clinic's imprimatur[1] on Onko-Sure was material and important for the product to gain traction against more established and accepted tests, such as the CEA test that had been around since the early 1980s.

13.     Radient intentionally misled investors to believe that it was conducting its clinical trial with the Mayo Clinic because Radient was in the process of raising additional financing.

14.     Twelve days later, on January 30, 2011 the Company signed a definitive agreement for the private placement of $8.4 million in Convertible Promissory Notes, providing Radient with $6.73 million in proceeds.

---

[1]  The Mayo Clinic is consistently ranked nationally as one of the country's best hospitals. According to the *U.S. News & World Report*, (http://health.usnews.com/best-hospitals/mayo-clinic-5000000) the Mayo Clinic is ranked #3 in Cancer.

15.    The January 18, 2011 press release was materially false and misleading because, according to an article issued by Thestreet.com on March 7, 2011: (a) the Mayo Clinic did not have a partnership agreement with the Radient; (b) the Mayo Clinic was not engaged in clinical studies with Radient; (c) the Mayo Clinic was not to provide any clinical study results about Onko-Sure; and (d) Mayo Clinic's relationship with Radient was limited to a contract with a subsidiary of the Mayo Clinic that sells blood and tissue samples to provide Radient blood samples taken from patients with colon cancer—which Radient purchased for use in its clinical study.

16.    This adverse news that Mayo Clinic was not conducting the Clinical Trial caused the Company's stock price fall over $0.15 cents per share, or 26%, from its prior closing price of $0.57 per share, on extraordinary volume.  That same day, the Company's stock was halted. (It resumed trading the following day.).

17.    On March 22, 2011, the Company filed an 8-K with the SEC stating that it had received a notice from the NYSE AMEX staff relating to the Company's continued listing on the AMEX.  According to the 8-L the NYSE AMEX staff believed the company failed to comply with NYSE AMEX rules for allegedly omitting material information in a written submission relating to Company made to the NYSE AMEX concerning recent press releases regarding the Company's purported relationship with the Mayo Clinic.

18.    Stated differently, the NYSE AMEX believed the Company lied to it.

19.    The March 22, 2011 8-K caused the Company's stock to fall  another 11.1%.

20.    On June 23, 2011, the Company issued a press release stating that its common stock would cease trading on the NYSE AMEX due to its continued non-compliance with NYSE AMEX rules.  This announcement caused the Company's stock to fall from $0.20/share to $0.15/share, or 37.0% on June 23rd, and an additional 16.2% on June 24, 2011.

## II.   JURISDICTION AND VENUE

21.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

22.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

23.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

24.   In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

25.   Court appointed lead plaintiffs Reydel Quintana, Dat Tan Tran, and Agnes Cho, purchased Radient common stock during the Class Period and have suffered damages as a result.   Lead Plaintiffs' PSLRA certifications were previously filed with the Court, and are incorporated by reference herein.

26.   Radient is a Delaware Corporation headquartered in Tustin, CA.

27.   During the Class Period Radient's common stock was actively traded on the AMEX, under ticker "RPC."   At all relevant times, Radient had less than ten employees.

28.   Defendant Douglas C. MacLellan ("MacLellan"), at all relevant times herein was the Company's Chairman of the Board and CEO since 2008.

29.   Defendant Akio Ariura ("Ariura"), at all relevant times herein was the Company's CFO since August 2006.

30.   MacLellan and Ariura are collectively referred to hereinafter as the "Individual Defendants."

31.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

32.     As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the AMEX and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

33.     Radient is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

34.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Radient under *respondeat superior* and agency principles.

## IV.  FALSE AND MISLEADING STATEMENTS

35.    The Class Period begins on January 18, 2011 when the Company issued a materially false press release concerning a "clinical trial" or "clinical study" for Onko-Sure that Radient falsely claimed it was conducting with the prestigious Mayo Clinic. The misleading press release states in relevant part:

RADIENT PHARMACEUTICALS ANNOUNCES PROGRESS AND POTENTIAL COMPLETION DATE FOR ITS ONKO-SURE® CLINICAL STUDY

TUSTIN, CA -- (Marketwire) -- 01/18/11 -- Radient Pharmaceuticals Corporation (NYSE Amex: RPC), a US-based company specializing in the research, development, and international commercialization of In Vitro Diagnostic cancer tests, announced today **progress on its clinical study with Mayo Clinic ("Mayo")** for the validation of the Company's US FDA-cleared Onko-Sure(R) in vitro diagnostic (IVD) cancer test as a useful tool in the detection of colorectal cancer in all stages of CRC, especially early stages where effective diagnosis leads to better patient prognosis. Based on recent advancements, **RPC anticipates it will complete the clinical trial with Mayo in the first quarter of 2011.**

**The clinical trial represents the largest study conducted to date for RPC's Onko-Sure® IVD cancer test. Approximately 1,000 colorectal patient samples with various disease stages are being tested in parallel by RPC and Mayo to directly compare the efficiency of the Onko-Sure® test with the Carcinoembryonic Antigen (CEA) test.** Patients with confirmed clinical diagnoses are tested across six clinically distinct patient groups that include: (1) Stage I colon cancer; (2) Stage II colon cancer; (3) Stage III colon cancer; (4) Stage IV colon cancer; (5) Control subjects who are confirmed negative for colon cancer; and (6) Control subjects with benign polyps of the colon. Many distinct patient groups are included in the trial in order to add multiple layers of data and conclusions to the analyses.

Topline goals of the study include: (1) validation of the overall effectiveness of Onko-Sure(R) for the detection of colorectal cancer as compared with normal and benign controls; (2) assessing the efficiency of Onko-Sure(R) in each independent colorectal cancer stage; (3) assessing the overall efficiency of RPC's Onko-Sure(R) IVD test as compared with that of the CEA test; and

(4) comparing the stage-specific efficacy of Onko-Sure(R) versus CEA; especially early cancer stages. ...

36.     Commenting on the clinical trial with the Mayo Clinic in the press release, defendant MacLellan trumpeted that the clinical trial with the Mayo Clinic was a "milestone" and further reiterated that the Company's was working hand and hand with the Mayo Clinic to test Onko-Sure.  MacLellan is quoted as follows in the announcement:

> "We are proud to have **reached this important milestone**," commented Douglas MacLellan, Chairman and CEO of Radient Pharmaceuticals. "RPC's executive team has been aggressively cultivating relationships across a broad base of oncology and healthcare practitioners and the consistent feedback we've received regarding the long-term potential of Onko-Sure® test has been overwhelmingly positive. **To have internationally recognized leaders in oncology take such great interest in Onko-Sure® is a testament to the importance of the test and we look forward to the long-term and positive impact these relationships and results of the Mayo study can potentially have for cancer physicians and their patients, our Company and shareholders."** [2]

37.     Defendants' statements were materially false and misleading because there was no "Mayo study".  Defendants misled investors to believe the Mayo Clinic was actively conducting the Onko-Sure clinical study in an effort to attach greater prestige, importance and a higher likelihood of success to their clinical study in an effort to inflate the price of Radient stock.

38.     The truth is that (a) the Mayo Clinic was not engaged in clinical studies with Radient; (b); the Mayo Clinic was not to provide any clinical study results for Onko-Sure; and (c) the Mayo Clinic did not have any partnership

---

[2]   Radient appears to have issued two versions of this press release.  Another version posted on its website differs from the one cited above, in that the last sentence of the quoted paragraph reads "To have internationally recognized leaders in oncology take such great interest in Onko-Sure® is a testament to the importance of the test. **We believe these relationships and the results of the Mayo Clinic study will help to establish Onko-Sure as the new standard of care for monitoring CRC patients."**

agreement with Radient. Its sole relationship to Radient was for a subsidiary to sell blood samples that Radient might use in its clinical study.

39.    On March 7, 2011 an article was published by TheStreet.com revealing the materially misleading and false nature of the Company's January 18, 2011 press release. The article states in relevant part:

> Mayo Clinic Denies Test Link to Radient Pharma
> Adam Feuerstein
> 03/07/11
>
> TUSTIN, Calif. (TheStreet) -- The Mayo Clinic is denying statements made by Radient Pharmaceuticals(RPC) about the prestigious research hospital's involvement in a clinical study of Radient's cancer-screening test Onko-Sure.
>
> "Mayo is not engaged in clinical studies with Radient and does not have a partnership agreement with Radient," Mayo Clinic spokesperson Kathy Anderson said in a statement emailed to TheStreet Friday.
>
> Mayo Clinic's statement contradicts Radient's recent pronouncements regarding the pending release of results from a new clinical validation study of Onko-Sure, a blood-based cancer screening test. Questions about the exact nature of the relationship between Radient and Mayo come a week after similar doubts were raised about an Onko-Sure venture in India touted by Radient.
>
> In a press release issued Jan. 18, Radient said it was making "progress on its clinical study with Mayo Clinic for the validation of the company's US FDA-cleared Onko-Sure" test. Results from this study are expected before the end of the first quarter.
>
> **The same Radient press release described the Onko-Sure clinical study as one in which "1,000 colorectal patient samples with various disease stages are being tested in parallel by RPC [Radient] and Mayo..."**
>
> Onko-Sure is a blood-based test cleared for use in the U.S. to measure the progression of colon cancer in patients already diagnosed with the disease. Despite FDA approval, Radient has failed to generate significant revenue from Onko-Sure, placing the company's financial health in severe jeopardy.

Radient is hoping that results from this new study will generate interest and sales of Onko-Sure to oncologists. Radient's moribund stock price is in desperate need of a revamp too, so invoking the imprimatur of Mayo Clinic has been a prominent part of the company's public relations strategy. **But in linking Mayo Clinic to Onko-Sure, Radient appears to be exaggerating the research hospital's involvement and interest.**

In order to conduct the Onko-Sure study, Radient needed blood samples taken from patients with colon cancer, so the company turned to a subsidiary of Mayo that collects and stores tissue and blood samples for use in scientific research. The Mayo Clinic subsidiary sold the blood samples to Radient.

"Mayo Clinic does have a collaboration agreement with Radient whereby Mayo Validation Support Services provided bio specimens from our Bio Specimen Bank to Radient for clinical studies," said Mayo spokesperson Anderson.

"The services Mayo was required to provide to Radient have been fulfilled. Any clinical study results about Onko-Sure would be provided by Radient, not Mayo Clinic," she added.

Radient was informed of Mayo's statement regarding the Onko-Sure clinical study but a spokesperson for the company declined to answer questions or comment.

40.     Following this negative news, on March 7, 2011, the Company's stock price fell over $.15 cents per share, or 26%, from its prior closing price of $.57 per share, on extraordinary volume.  That same day, the Company's stock was halted. (It resumed trading the following day.).

41.     Not surprisingly, on or before March 9, 2011, Radient removed the false January 18, 2011 press release from the Company's website.

42.     On March 22, 2011, the Company filed an 8-K with the SEC stating that it received a notice from the NYSE AMEX staff relating to the Company's continued listing on the AMEX, stating that the NYSE AMEX staff believed that it was lied to by the Company concerning the Company's purported relationship with the Mayo Clinic.  The 8-K states in relevant part:

On March 16, 2011, we received another notice from the NYSE Amex Staff stating their **belief that we failed to comply with certain NYSE Amex disclosure requirements, specifically, those contained in Sections 401(e) and 402(e) of the Company Guide and that we failed to comply with Section 132(e) of the Company Guide for allegedly omitting material information in the written submission to the NYSE Amex regarding our request for an appeal. These claims center around the recent press releases regarding our collaboration agreement with Mayo Validation Support Services (MVSS) and whether the information contained in our press releases and submission to the NYSE Amex was materially misleading to investors and the NYSE Amex.** As stated in our March 8, 2011 press release, we entered into a collaboration agreement with MVSS, which is a service line of Mayo Collaborative Services, Inc. We have been provided with the opportunity to address the Staff's most recent determination and intend to timely do so in connection with our appeal hearing before the Listing Qualifications Panel. Our securities are expected to remain listed on the NYSE Amex pending a determination by the Listing Qualifications Panel following the hearing. The hearing has been postponed and is in the process of being rescheduled. Although there can be no guarantee as to the final hearing date, we expect to establish a new date in the near future. After the hearing, once the Listing Qualifications Panel renders a decision, we will issue a press release and file another 8-K to disclose the results.

43.     The March 22, 2011 8-K caused the Company's stock 11.1% on March 22, 2011.

44.     On June 23, 2011, the Company issued a press release stating that its common stock would cease trading, i.e. delisted, from the AMEX due to its continued non-compliance of NYSE AMEX rules.  This announcement caused the Company's stock to fall from $0.20/share to $0.15/share, or 37% on June 23rd, and an additional 16.2% on June 24, 2011.

## V.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

45.     At all relevant times, the market for Radient's common stock was an efficient  market for the following reasons:

(a)     Radient's stock met the requirements for listing, and was listed and actively traded on the AMEX, a highly efficient and automated national market;

(b)     During the class period, on average, 29.3 million shares of Radient's stock were traded on a weekly basis.   During the Class Period approximately 117.4 million shares were outstanding.  Approximately, 25% of all outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c)     As a regulated issuer, Radient filed with the SEC periodic reports during the Class Period;

(d)     During the Class Period, Radient was eligible and did file short-form registration statements on Form S-3 with the SEC;

(e)     Radient regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     Radient was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(g)     Several dozen FINRA member firms were active market-makers in Radient stock at all times during the Class Period;  and

(h)     Unexpected material news about Radient was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

46.     As a result of the foregoing, the market for Radient's common stock promptly digested current information regarding Radient from all publicly available sources and reflected such information in Radient's stock price.   Under these

circumstances, all purchasers of Radient's common stock during the Class Period suffered similar injury through their purchase of Radient's common stock at artificially inflated prices, and a presumption of reliance applies.

## VI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Radient during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Radient's common stock was actively traded on the AMEX. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Radient or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

49.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

51.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the misstatements and omissions alleged herein were made with scienter;

(c)     whether statements made by the Individual Defendants to the investing  public during the Class Period misrepresented and/or omitted material facts about the business, prospects, and operations of Radient; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

53.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

54.     This First Claim is asserted against all Defendants.

55.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell Radient common stock at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Radient as specified herein.

57.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Radient's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Radient and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Radient's common stock during the Class Period.

58.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives,  directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the Individual Defendants was aware of the Company's dissemination  of information to the investing public that they knew or recklessly

disregarded was materially false and misleading; and (5) each of the Individual Defendants culpably participated in the wrongful conduct alleged herein.

59.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Radient's financial condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Radient's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Radient's publicly-traded common stock were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired and/or sold Radient common stock during the Class Period at artificially high prices and were damaged thereby.

61.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be

true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Radient's financial results, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Radient common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

62.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

64.     This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## VIII. SECOND CLAIM

### Violation Of Section 20(a) of
### The Exchange Act Against the Individual Defendants

65.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

66.     This Second Claim is asserted against each of the Individual Defendants.

67.     The Individual Defendants acted as controlling persons of Radient within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of  the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and

dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

68.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69.   As set forth above, Radient violated Section 10(b) and Rule 10b-5. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

70.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 8, 2011                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**


                                       _____
                                       Laurence M. Rosen, Esq. (SBN 219683)
                                       THE ROSEN LAW FIRM, P.A.
                                       333 South Grand Avenue, 25th Floor
                                       Los Angeles, CA 90071
                                       Telephone: (213) 785-2610
                                       Facsimile: (213) 226-4684
                                       Email: lrosen@rosenlegal.com

                                       Lead Counsel for Lead Plaintiffs and Class

Amended Class Action Complaint for Violation of the Federal Securities Laws

## CERTIFICATE OF SERVICE

I, Leonid Prilutskiy, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

I am an employee of the Rosen Law Firm, P.A. I am over the age of eighteen. On July 8, 2011, I served filed the following **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** by U.S. mail to counsel of record for all defendants at the addresses listed below:

> Robert D. Weber
> DLA Piper US LLP
> 1999 Avenue of the Stars, Fourth Floor
> Los Angeles, California 90067
>
> Attorney for Radient Pharmaceuticals Corporation
>
> Ho-El Park
> Law Offices of Ho-El Park
> 66281 Beach Boulevard Suite 125
> Buena Park, CA 90621
>
> Mark David Hunter
> Hunter Taubman Weiss LLP
> 255 University Drive
> Coral Gables, FL 33134
>
> Attorneys for Akio Ariura and Douglas C. MacLellan

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on July 8, 2011, in New York, New York.

Leonid Prilutskiy