O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| VINH NGUYEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RADIENT PHARMACEUUTICALS CORPORATION, DOUGLAS C. MACLELLAN, and AKIO ARIURA,<br><br>Defendants. | Case No.: SA CV 11-0406 DOC(MLGx)<br><br><br>ORDER GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS (Dkt. 48) |

Before the Court is Plaintiffs' Motion For Class Certification (Dkt. 48).  After considering all papers filed, and oral argument, the Court GRANTS Plaintiffs' Motion in its entirety.

//

//

## I.     Introduction

Lead Plaintiffs Reydel Quintana, Dat T. Tran, and Agnes Cho (Plaintiffs), filed the operative Amended Complaint (Am. Compl., Dkt. 14) in this case on July 8, 2011.  They alleged two causes of action on behalf of all persons and entities who purchased the common stock of Defendant Radient Pharmaceuticals Corporation ("Radient") from January 18, 2011 through March 4, 2011 (the Class Period).[1]  Am. Compl. ¶ 1.

The first cause of action is a violation of Section 10(b) of the Securities and Exchange Act of 1934 (the Exchange Act) and SEC Rule 10b-5.  The second cause of action claims that officers of Radient are liable as control persons of the company (Section 20(a) of the Exchange Act).  Plaintiffs sued Radient, Radient's Chairman of the Board and CEO, Douglas C. MacLellan (MacLellan), and Radient's CFO, Akio Ariura (Ariura) (collectively, referred to as Defendants).

The Section 10(b) and Rule 10b-5 claim was brought against all parties, but on October 26, 2011, this Court granted a Motion To Dismiss that claim as to Ariura.  Order Granting In Part And Denying In Part Motion To Dismiss (Dkt. 30).  Plaintiffs elected not to amend their complaint.  Notice Of Lead Plaintiffs' Intent Not To Amend (Dkt. 31).  Thus, the remaining claimses are Section 20(a) as to Ariura and MacLellan, and Section 10(b) and Rule 10b-5 as to MacLellan and Radient.

Plaintiffs have brought this Motion seeking to certify a class, and Defendants have filed two Oppositions: one on behalf of Radient (Dkt. 58), and the other on behalf of Ariura and MacLellan (Dkt. 59).  For the reasons that follow, the Court GRANTS Plaintiffs' Motion To Certify Class.

## II.    Background[2]

Radient is a small pharmaceutical company whose main business is the research, development, manufacturing, and sale of Onko-Sure, a U.S. Food and Drug Administration

---

[1] The Class would exclude Defendants, along with the present and former officers and directors of Radient and any of its subsidiaries, their immediate families, and their "legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest."  Mot. 1 n.1.

[2] The background section is drawn largely from previous Orders on motions to dismiss (Dkts. 29 & 30).

("FDA") approved In-Vitro Diagnostic Cancer Test.  Amd. Cmpl. ¶¶ 2-3.  Since at least the early 1980's, Onko-Sure has allegedly competed with the industry standard, the Carcinoembryonic Antigen marker test (the "CEA").  *Id.* at ¶ 3.  Radient's efforts to convince medical practitioners and institutions to utilize Onko-Sure, instead of the CEA, have allegedly been a slow and expensive process.  *Id.* at ¶ 4.  Radient's reported revenue for the 2010 fiscal year was $231,662, its operating expenses were over $14 million, and its net loss was $85,711,853. *Id.* at ¶ 5.  Radient allegedly acknowledged in its SEC filings that its ability to continue operations was dependent upon raising additional capital.  *Id.* at ¶ 6. In short, Plaintiffs aver that, in the time leading up to the Class Period, Radient was desperate for operating cash. *Id.* at ¶ 9.

Additionally, Plaintiffs claim that, in the time leading up to the Class Period, Radient was also engaged in litigation with investors for either being in default or breach of its financing obligations.  *Id.* at ¶ 11.  Therefore, Plaintiffs allege that, Radient's stock price declined before the Class Period and its financing costs increased, including its ongoing obligations to pay interest and issue additional stock to existing investors. *Id.* Accordingly, Plaintiffs claim that Radient was under intense pressure to prevent any further stock price declines. *Id.*

Plaintiffs are suing over a press release issued on January 18, 2011, in which Defendants stated that Radient and the prestigious Mayo Clinic were conducting a clinical trial together for Onko-Sure.  *Id.* at ¶¶ 2-3, 12, 35-36.  Plaintiffs claim that Radient misled investors, taking advantage of the importance associated with such a joint clinical trial so that the company could inflate its stock price and raise more financing.  *Id.* at ¶¶ 13, 37.  Plaintiffs claim that just twelve days after the press release, on January 30, 2011, Radient successfully raised additional financing when it completed its largest offering ever.  *Id.* at ¶ 14.  Specifically, Radient received $6.73 million in proceeds when it signed a definitive agreement for the private placement of $8.4 million in Convertible Promissory notes.  *Id.*

Plaintiffs allege that the press release was materially false and misleading because, according to an article issued by TheStreet.com on March 7, 2011: (1) the Mayo Clinic did not have a partnership agreement with Radient; (2) the Mayo Clinic was not engaged in clinical

studies with Radient; (3) the Mayo Clinic was not to provide any clinical study results about Onko-Sure; and (4) the Mayo Clinic's only relationship with Radient was a contract between Radient and a subsidiary of the Mayo Clinic that sold blood and tissue samples for Radient's clinical trial.[3]  *Id.* at ¶ 15.  Plaintiffs aver that the news that the Mayo Clinic was not conducting a clinical trial with Radient caused Radient's stock to drop dramatically.  *Id.* at ¶¶ 16, 40.  The Company's stock price fell about 21 percent from its opening price on the day of TheStreet's report.  Mot. 2.  The extent of any collaboration between Radient and Mayo is sharply disputed, *see* Opp. 3-5; Reply 3-7, but that is properly a merits issue.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).[4]

### III.    Legal Standard

Federal Rule of Civil Procedure 23 governs class actions.  Fed. R. Civ. P. 23.  A party seeking class certification must demonstrate the following prerequisites: "(1) numerosity of plaintiffs; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the

---

[3] TheStreet.com article states in relevant part:

Mayo Clinic Denies Test Link to Radient Pharma
Adam Feuerstein
03/07/11

"The Mayo Clinic is denying statements made by Radient [ . . .] about the
prestigious research hospital's involvement in a clinical study of Radient's cancer screening
test Onko-Sure.

'Mayo is not engaged in clinical studies with Radient and does not have a partnership Agreement with
Radient,' Mayo Clinic spokesperson Kathy Anderson said [. . .]

'Mayo Clinic does have a collaboration agreement with Radient whereby Mayo Validation Support
Services provided bio specimens from our Bio Specimen Bank to Radient for clinical studies, said Mayo
spokesperson Anderson.'"

[4] Defendants have not made an argument that Plaintiffs needed, and failed, to prove materiality, which
also is a merits issue.  *Connecticut Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th
Cir. 2011) *cert. granted*, 132 S. Ct. 2742, 183 L. Ed. 2d 614 (U.S. 2012).  Defendants Ariura and
MacLellan also make a brief merits argument under typicality.  *See infra* at 9 & n.5.

1   class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citing Fed. R. Civ. P.

2   23(a)).  A district court must engage in a "rigorous analysis" to determine whether the party

3   seeking certification has met the prerequisites of Rule 23(a).  *Valentino v. Carter-Wallace, Inc.*,

4   97 F.3d 1227, 1233 (9th Cir. 1996) (quoting *In re Am. Med. Sys.*,75 F.3d 1069, 1079 (6th Cir.

5   1996)).  The party may not rest on mere allegations, but must provide facts to satisfy these

6   requirements.  *Doninger v. Pac. Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977).

7         In addition to satisfying the four prerequisites of numerosity, commonality, typicality,

8   and adequacy, a party must also demonstrate either: (1) a risk that separate actions would create

9   incompatible standards of conduct for the defendant or prejudice individual class members not

10   parties to the action; or (2) the defendant has treated the members of the class as a class, making

11   appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common

12   questions of law or fact predominate over questions affecting individual members and that a

13   class action is a superior method for fairly and efficiently adjudicating the action.  Fed. R. Civ.

14   P. 23(b).  Here, Plaintiffs move only under (b)(3).

15         The decision to grant or deny a motion for class certification is committed to the trial

16   court's broad discretion.  *See, e.g.*, *Yamamoto v. Omiya*, 564 F.2d 1319, 1325 (9th Cir. 1977).

17   In determining whether a plaintiff has satisfied the requirements of Rule 23, a court may not

18   inquire into whether the plaintiff will prevail on the merits of the case.  *Eisen v. Carlisle &*

19   *Jacquelin*, 417 U.S. 156, 177-78, (1974).  However, though a court must accept the substantive

20   allegations in the complaint as true, *In re Coordinated Pretrial Proceedings in Petroleum Prods.*

21   *Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982), in some cases it may be necessary for the

22   court to look beyond the pleadings to determine whether the plaintiff has satisfied the

23   certification requirements.  *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160, (1982).

24      **IV.   Discussion**

25         Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 and Rule

26   10b–5.  The elements of a § 10(b) private action are: "(1) a material misrepresentation or

27   omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

28   omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).  They also assert claims against Ariura and MacLellan for violating Section 20(a) of the Securities Exchange Act, which requires (1) an underlying violation of securities laws, and (2) that the individual defendants exercised actual power or control over the primary violator.  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

The chief point of contention here is the reliance element of the § 10(b) and 10b-5 claim. If Plaintiffs have to show how each individual investor relied on the press release, suing as a class would not be practical.  The concept of fraud on the market resolves this issue:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic v. Levinson*, 485 U.S. 224, 241-242 (1988) (quoting *Pell v. Speiser*, 806 F.2d 1154, 1160-61 (3rd Cir. 1986)).  Thus, fraud on the market offers a rebuttable presumption of reliance by a class of investors.  *Basic*, at 241-42.  That presumption of reliance means that common issues predominate over individual ones, which is a requirement of the class certification that Plaintiffs seek.  Fed. R. Civ. P. 23(b)(3); *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6 (2011).  The Court will consider each requirement of Rule 23 in turn.

### a.  Numerosity

Numerosity, the first requirement for class certification, requires that the class be "so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  There is no specific minimum number of plaintiffs asserted to obtain class certification, but a proposed class of at least forty members presumptively satisfies the numerosity requirement.  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 *Newberg On Class Actions 2d*, (1985 ed.) § 3.05).  And "where the exact size of the proposed class is unknown, but

general knowledge and common sense indicate it is large, the numerosity requirement is satisfied." *In re Intermec Corp. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) 96, 178 (W.D. Wash.1991) (citing *Weinberger v. Thornton,* 114 F.R.D. 599, 602 (S.D. Cal. 1986); *Schwartz v. Harp,* 108 F.R.D. 279, 281-282 (C.D. Cal. 1985)).

Here, about 166.9 million shares were traded during the Class Period.  Howard J. Mulcahy Decl., Ex. 1 to Rosen Decl. at ¶ 21 (hereafter Mulcahy Decl.).  That amount clearly satisfies a common sense presumption that there are enough class members to make joinder impracticable.  *See, e.g.*, *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985) (finding numerosity based on an estimate of several million shares purchased during class period).  No Defendant contests this factor.  Defendants MacLellan and Ariura do state in their Opposition that "Plaintiffs fail to meet all four (4) prerequisites to proceed under Rule 23(a)," but then make no numerosity argument.  Ariura & MacLellan Opp. 4.  Accordingly, numerosity is satisfied.

### b.  Commonality

The "commonality" prerequisite mandates that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality requires that class members share a common injury and this injury is "capable of classwide resolution," meaning that determination of the claims' "truth or falsity will resolve an issue that is central to [the claims'] validity."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1019 (9th Cir. 1998).  As the Ninth Circuit has explained, "[t]he commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3) [predominance]."  *Id.*

Plaintiffs correctly contend that their allegations raise common questions of law and fact that include: (1) whether Defendants violated the Securities and Exchange Act; (2) whether Defendants made statements to the investing public during the Class Period that misrepresented and/or omitted material facts about Radient; (3) whether misstatements and omissions were made with the required scienter; and (4) whether members of the Class sustained damages and

the measure of those damages.  In an action alleging misrepresentations reported by a company, the Ninth Circuit has noted that "[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."  *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (citing cases).

Only Defendants Ariura and MacLellan contest commonality, but do so by seizing on one sentence in Plaintiffs' brief—that "all plaintiffs were injured by the statements in the same way"—and then asserting that such a statement is "overly broad and generic."  Ariura & McLellan Opp. 4.  This argument fails because it does not address the Plaintiffs' actual argument and the common questions Plaintiffs identify.

### c.  Typicality

The typicality requirement under Rule 23(a)(3) is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The purpose of the typicality requirement "is to assure that the interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Plaintiffs' claims are typical if they "are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Defendants Ariura and MacLellan argue that Plaintiffs' class definition does not "take into consideration whether the class members or representatives were aware of the Jan. 18th Press Release, or whether its class representatives or Plaintiffs actually suffered injury or loss." Ariura & MacLellan Opp. 5.  This appears to be an attempt to challenge whether Plaintiffs can sufficiently show common reliance on alleged misrepresentations, and also to include an argument about the merits (if "Plaintiffs actually suffered injury or loss").  Reliance is properly considered under Rule 23(b)(3), in the analysis of whether common questions will predominate over individual inquiries.  To the extent Ariura and MacLellan argue the merits (e.g., that

"Plaintiffs have not provided any facts to establish that the Jan. 18th press release contained any false or misleading information," Ariura & MacLellan Opp. 5), that merits argument does not bear on this Motion.[5]

Here, the Class Plaintiffs bought significant amounts of stock,[6] and have alleged claims that derive chiefly from one press release, and thus are certainly "not unique to the named plaintiffs," *Hanon*, 976 F.2d at 508. Further, Defendants offer no facts that would call typicality into question, such as defenses they may have that would be unique to the Class Plaintiffs. *See Id.*

### d.  Adequacy of the Named Representative

An adequate representative is one who will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Due process requires that absent class members have an adequate representative. *See Hansberry v. Lee*, 311 U.S. 32, 43 (1940). A representative is adequate where (a) there is no conflict of interest between the representative and its counsel and absent class members, and (b) the representative and its counsel will "pursue the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 120 (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).

Lead Plaintiffs have submitted affidavits outlining their willingness to take on the duties of class plaintiffs, Rosen Decl., Exs. 3 through 5, and no Defendant has contested any aspect of

---

[5] "The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment." *Blackie*, 524 F.2d at 901 n.17; *see also Amgen Inc.*, 660 F.3d at 1175. The Court notes Plaintiffs have provided deposition transcripts in which Mayo Validation Support Services (MVSS) employee Laura Hanson states that MVSS was not asked to do any data analysis with respect to Onko-Sure. Hanson Depo. 53:6-54:3, Ex. 2 to Rosen Reply Decl. (Dkt. 61-2).

[6] Plaintiffs have represented that Plaintiff Quintana bought 136,400 shares of Radient common stock during the Class Period, at a cost of about $99,000, and sold about 88,000 of those shares. Quintana claims losses of $23,660.00. Plaintiff Tran bought 359,776 shares of Radient common stock during the Class Period at a cost of $263,769.60, and sold 292,000 of those shares. Tran claims losses of $30,035.75. Plaintiff Cho purchased 36,000 shares of Radient common stock during the Class Period at a cost of $30,150.00. Cho retained all of those shares and claimed losses in the amount of $16,542.00. Memorandum In Support Of Motion For Appointment As Lead Plaintiff (Dkt. 10) (citations omitted).

-9-

this factor.  Based on these affidavits, and a review of the firm résumé, Rosen Decl., Ex. 2, the Court finds the adequacy prong met.

### e.  Rule 23(b)(3)

In a footnote in *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6 (2011), the Supreme Court noted that, in a class action for securities fraud

> Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members" would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation. But the problem dissipates if the plaintiffs can establish the applicability of the so-called "fraud on the market" presumption, which says that all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements. To invoke this presumption, the plaintiffs seeking 23(b)(3) certification must prove that their shares were traded on an efficient market . . .

Plaintiffs and Radient have both properly focused their arguments on reliance upon any misrepresentation: if reliance is a common fact across the class, then a class action is an appropriate mechanism to resolve this legal dispute, because the common questions can lead to a common answer.  But if reliance varies plaintiff by plaintiff, it is clear that individual issues would predominate over common ones, and thus class certification would be denied under Rule 23(b)(3).

#### i.  *Cammer* Factors

The Ninth Circuit has used *Cammer* factors, *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D. N.J. 1989), to help determine if the particular market for a stock is efficient.  *Binder v. Gillespie*, 184 F.3d 1059 (9th Cir. 1999).  If the market is efficient, then plaintiffs trigger a rebuttable presumption of reliance.  The *Cammer* factors address "first, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitrageurs; fourth, whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and fifth, whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* (quoting *Cammer*,

711 F.Supp. at 1286-87).  These factors are merely tools for the analysis, and can be supplemented by other measures.  *See, e.g.*, *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005).  The Court will consider each factor in turn, and also briefly note that Plaintiffs have also shown other factors that indicate market efficiency.  *See id.*

### 1.  Trading Volume Supports Market Efficiency

A high average trading volume supports a finding of market efficiency, because it "implies significant investor interest in the company," and that interest "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  Turnover, "measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."  *Id.* (citation omitted).  Here, the average weekly trading volume for Radient stock in the Class Period was 31.7 percent of Radient's outstanding shares.  Mulcahey Decl. ¶ 21.  Thus, the Court agrees with Plaintiffs that this factor weighs strongly in favor of an efficient market, and no Defendant has contested this factor.

### 2.  Analyst Coverage

Coverage by securities analysts indicates market efficiency because the price of a company's stock is often affected by analyst reports of information they learn about that stock.  *See Cammer,* 711 F. Supp. at 1286.

Here, Plaintiffs and Radient contest the proper measure when a proposed Class Period is only thirty-three trading days, and forty-six days in total.  Plaintiffs' expert identified two analysts issuing seven reports within the Class Period, and then expanded the period examined to cover an entire year.  Plaintiffs' expert found fifty-eight reports from ten different analysts during that year.  Mulcahey Decl. ¶ 24.  Plaintiffs' expert explained that this analysis of a year's worth of data would provide a sufficiently large sample size for the analysis, and for comparison against other cases that have had longer class periods.  Mulcahey Decl. ¶ 17; Mulcahey Reply Decl. ¶ 12.  Further, Radient had no earnings announcements during the Class Period, which means that a typically newsworthy activity fell entirely outside the Class Period.  *See* Mulcahey

Reply Decl. ¶ 12.  This is further indication that the Class Period may not be a reliable data sample.

Defendant Radient argues that expanding analyst coverage to an entire year is improper, that Plaintiffs cite no cases for doing so, and that Plaintiffs insufficiently identify the analysts.  Upon review of the identified analysts and exhibits, Mulcahey Decl. Ex. 4, the Court believes they have been sufficiently identified.  Whether reports outside the Class Period support a finding of market efficiency is a more difficult question.

To argue that the two analysts writing reports during the Class Period weighs against market efficiency, Defendants cite cases with longer class periods.  Opp. 9-10 (citing *In re Nature's Sunshine Prod.'s Sec. Litig.*, 251 F.R.D. 656, 662 (D. Utah 2008) (four analysts over a year "somewhat" weighs in favor of efficiency); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (two analysts over 21 month period, along with significant news reports, "does not strongly weigh in support" of market efficiency); *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870 at *7 (D.S.C. Nov. 1, 2004) (two or three analysts providing credit research on bonds does not support market efficiency for class suing over bonds issued in 1998 and 1999).  One might argue that two analysts over a month and a half class period, if one adjusts for short length of that period, is a stronger showing than the cases Defendant cites.

The point here is that this *Cammer* factor is less useful for a short class period.  If the benchmark is simply a raw number, then a longer Class Period is more likely to meet the test under this factor.  Such a counting game seems antithetical to a thoughtful analysis of market efficiency.  Similarly, extrapolating from a small class period would be inaccurate in comparing this case to cases with longer class periods.  Accordingly, under the circumstances of this case, it appears that examining a full year makes the best of a difficult situation for analysis.  If there were almost no analysts reporting on Radient outside of the Class Period, that finding could indicate that reports during the Class Period were unusual, and inconsistent with regular analyst coverage.  Here, ten analysts and 58 reports over a year is some evidence of sufficient analyst coverage for market efficiency.  Granted, this is imperfect evidence because the bulk of those

reports fall outside the class period, and Defendants correctly contend that several analysts either wrote about Radient before the Class Period, or afterward, but did not write about Radient continually over the course of the year.  Three points convince this Court that this factor weighs slightly in Plaintiffs' favor, or is at worst a neutral factor: (1) there are a sizable number of reports and analysts outside the Class Period; (2) there are two analysts and seven reports within the Class Period; and (3), there are many news stories and press releases about Radient throughout the year examined (1,460 such stories and releases, and 270 within the Class Period, as Plaintiff noted at oral argument), Mulcahey Decl. ¶¶ 27-29.  The Court remains skeptical of the value of this factor in a short Class Period, but nonetheless believes the factor should not preclude a finding of market efficiency.

### 3.   Plaintiffs Correctly Contend That The Market Makers Factor Weighs In Their Favor

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *In re Countrywide Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009).  Plaintiffs correctly contended in their Motion that an assessment of the number of market makers, if simply borrowed from *Cammer*, adds nothing to the analysis of market efficiency in this case.  *See* Mot. 12.   In *Cammer*, the company's stock was traded within a grouping of over the counter stocks, rather than on an exchange such as the New York Stock Exchange.  *Cammer*, 711 F. Supp. at 1280.  One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market.  *Id.*  In rejecting that broad distinction, the court noted that "the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades." *Id.* at 1281 (citation omitted).

But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency. Bromberg & Lowenfels on Securities Fraud § 7:484 (2d ed. 2012) ("For over the counter

markets without volume reporting, the number of market makers is probably the best single criterion [for market efficiency]").[7]  By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker.  Mulcahey Reply Decl. ¶ 23.  That one Designated Market Maker is drawn from a small pool of available Designated Market Makers.  *Id.*

Plaintiffs are thus correct when they state that Radient's argument that they "provide no reliable evidence of market-makers and arbitrageurs" and "fail to identify even a single one," is a red herring.  Reply 12; Radient Opp. 11.  Plaintiffs' Expert Mulcahey further states that the amount of short interest in Radient common stock during the Class Period was at a level consistent with other NYSE firms.  Mulcahey Decl. ¶ 88.  Such a result is "consistent with a well-functioning and efficient market," and indicates a level of arbitrageur[8] activity, such that this *Cammer* factor weighs in Plaintiffs' favor.  *Id.*  Defendants do not make a viable challenge to Mulcahey's analysis on this point, and thus the Court finds this factor supports market efficiency and a fraud on the market presumption.

### 4.  Radient Did Not Meet The Requirements To File A Form S-3 With The SEC

A fourth factor under *Cammer* is whether Radient was eligible to file an SEC registration Form S-3.  That form is a short form registration statement reserved for companies (1) with $75

---

[7] This same treatise states that "at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."  Bromberg, ¶ 7:484; *see also In re Initial Public Offering Securities Litigation*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency.").  Such a distinction could be used inconsistently with the specific analysis of the market for each stock, *Cammer*, 711 F. Supp. at 1281, but the point remains: this factor favors Plaintiffs, and the mere number of market-makers is not a good metric when a stock is assigned one market-maker by an exchange.

[8] An arbitrageur, by definition, takes advantage of inefficiencies between markets, *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp*, CV 07-07097-MRP-MAN, 2008 WL 8166001 (C.D. Cal. Nov. 13, 2008), meaning that the arbitrageur tries to profit from trading mispriced securities, Mulcahey Decl. ¶ 88.

million in common equity held by non-affiliates of the registrant and (2) that have filed reports with the Securities and Exchange Commission for 12 consecutive months. *See* 17 C.F.R. § 239.13. "Courts have found that the SEC permits an S-3 Registration statement 'only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006) (hereafter *Teamsters*) (citations omitted). The SEC has relaxed the requirements for S-3 eligibility since *Cammer*, [9] but the factor remains an important one for courts. *Krogman v. Sterritt,* 202 F.R.D. 467, 477 (N.D. Tex. 2001) (citing cases).

On this factor, Plaintiffs attempt to argue beyond what the evidence shows. They assert that "Radient was eligible and did file" the S-3 Form. Mot. 12. But their citation to their own expert reveals that Radient fell short of the $75 million threshold of stock held by non-affiliates. *See* Mulcahey Decl. ¶ 36. The value of stock held by non-affiliates ranged from $29.5 million to $73.1 million during the Class Period. *Id.* at n.33. Plaintiffs' argument is that "to the extent that the SEC accepted Radient's Forms S-3 [during the Class Period], the SEC believed that Radient's stock was adequately efficient." Reply 12. But the point is *eligibility* to file, not whether the SEC accepts a Form S-3 even though the company was ineligible.

Thus, this factor does not support market efficiency, but it is not fatal to Plaintiffs' Motion. This Court recognizes that *Cammer* factors are "an analytical tool, not a checklist" of requirements. *Teamsters*, 2006 WL 2161887 at *5. The fact that Radient's stock held by non-affiliates came within $2 million of the $75 million threshold during the Class Period also lessens the finding against market efficiency. Close counts for something in horseshoes, hand grenades, and non-affiliate stock value.

//

//

---

[9] At the time of *Cammer*, "companies could qualify to use the S-3 Registration Form only if they had filed SEC reports continuously for thirty-six months and had at least $150 million in float." *Krogman v. Sterritt,* 202 F.R.D. 467, 477 (N.D. Tex. 2001).

### 5.  Cause-and-Effect Relationship

The fifth *Cammer* factor is whether there are facts to support a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price.  This factor is "the essence of an efficient market and the foundation for the fraud on the market theory."  *Cammer*, 711 F. Supp. at 1287.  Despite the importance of this factor, no Defendant has provided an expert's report to contest the analysis by Plaintiffs' expert Mulcahey, nor did any Defendant make any substantial argument against the report's findings.[10]

This Court concludes that Mulcahey's analysis does support a finding of market efficiency.  Mulcahey examined the cause-and-effect relationship between relevant news events and responses in the price of Radient stock through an event study, Mulcahey Decl. ¶¶ 43-54, and tests of the reaction between the stock price and economic news, *id.* ¶¶ 55-59; the reaction of stock price to company press releases, *id.* ¶¶ 60-63; the speed of price reaction to new information, *id.* ¶¶ 64-67; and the correlation of absolute stock returns and daily trading volume, *id.* ¶¶ 68-72.[11]  These statistical results, uncontested by Defendants, support a finding of market efficiency for the core *Cammer* factor.  *See Cammer*, 711 F. Supp. at 1287.

### ii.  Other indicators of Market Efficiency

Plaintiffs further contend that other indicators of market efficiency, outside of the five *Cammer* factors, also support a fraud on the market presumption, and thus certification under

---

[10] Defendants Ariura and MacLellan argue that Mulcahey's entire analysis should be excluded for failing to use reliable methods because he looked beyond the Class Period for some factors.  Ariura & MacLellan Opp. 7.  There is nothing "highly misleading," *id.*, about this because Mulcahey spelled out precisely what he was doing, and why.  *See, e.g.*, Mulcahey Decl. ¶ 25.  Defendants Ariura and MacLellan may disagree with this analysis, but that disagreement does not entitle them to the windfall of excluding the entire report.  Their other argument is that a 1989 jury verdict against Mr. Mulcahey for tortious interference means he "does not enjoy a reputable reputation," and the Court should therefore exclude his report on market efficiency.  Ariura & MacLellan Opp. 8.  That argument is similarly unpersuasive.  Any connection to his credibility would, at best, be appropriate for a jury and not for wholesale exclusion of his report because it is somehow unreliable.  *See Elcock v. Kmart Corp.*, 233 F.3d 734, 750-51 (3d Cir. 2000) (holding that a district court could not consider, for Rule 702 analysis of reliability of an expert's methods, a challenge to the expert's credibility based on a past embezzlement charge).

[11] Relevant Exhibits for Mulcahey's analysis are Exhibits 3 and 5 through 12 to his Declaration.

Rule 23(b)(3).  Courts have found several of these factors useful in their analysis.  *Unger v. Amedisys Inc.*, 401 F.3d at 323.  For example, the bid-ask spread is a measure of "the difference between the price at which current stockholders are willing to buy the stock and the price at which current stockholders are willing to sell their shares."  *Cyberguard*, 213 F.R.D. at 501 (citing *Krogman*, 202 F.R.D. at 478).  In *Cyberguard*, a spread of 2.44 percent was found to weigh in favor of market efficiency.  213 F.R.D. at 501.  Here, the Mulcahey report shows a bid-ask spread of 0.58 percent, below the mean (1.13 percent) and median (0.72 percent) for 412 New York Stock Exchange or Amex securities of firms with a market capitalization similar to Radient's.  Mulcahey Decl. ¶¶ 75-78.

Other factors that Plaintiffs' expert examined supported market efficiency (e.g., autocorrelation tests, *id.*  ¶¶ 80-82, short interest, *id.* ¶¶ 87-90), while the level of institutional investors did not, *id.* ¶¶ 83-86.  Because Plaintiffs have clearly met the required showing for an efficient market for Radient stock in the Class Period, and thus the fraud on the market presumption, further discussion of these additional factors is unnecessary.

### iii.   A Class Action Is Also Superior Under Rule 23(b)(3) To Other Methods Of Litigating This Case

If united by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud.  *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 284 (N.D. Ala. 2009) (citing cases).  Concentrating litigation in one forum is desirable where a company was listed on a national exchange, and no one has identified a meaningful difficulty in managing this class action.

Defendants Ariura and MacLellan argue that variation in state law may overwhelm common issues, and in turn require a specific plan to manage variations within the class.  Ariura & MacLellan Opp. 8-9 (citing *Gartin v. S&M NuTec LLC*, 245 F.R.D. 425, 439 (C.D. Cal. 2007).  But this case is about federal securities laws, and even if the case "can essentially include individuals from all over the world," *id.* at 8, Section 10(b) of the Securities Exchange Act applies to securities bought from an American stock exchange, regardless of the location of the investor, *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884-86 (2010).

**IV.    Disposition**

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for class certification in its entirety.  It therefore certifies a class of all persons and entities who purchased the common stock of Radient from January 18, 2011 through March 4, 2011,[12] appoints Plaintiffs Quintana, Tran, and Cho as class representatives, and appoints the Rosen Law Firm, P.A., as class counsel.


DATED:        November 26, 2012

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

---

[12] The Class excludes Defendants, present and former officers and directors of Radient and any of its subsidiaries, their immediate families and their "legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest."  Mot. 1 n.1.