MARK DAVID HUNTER
mdhunter@htwlaw.com
(Admitted *Pro Hac Vice*)
Hunter Taubman Weiss LLP
255 University Drive
Coral Gables, Florida 33134
Tel:  305-629-8816
Fax: 305-629-8877

Attorneys for Defendants
DOUGLAS C. MACLELLAN
AND AKIO ARIURA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| REYDEL QUINTANA, DAT TAN TRAN, and AGNES CHO, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RADIENT PHARMACEUTICALS CORPORATION, DOUGLAS C. MACLELLAN, and AKIO ARIURA,<br><br>Defendants. | CASE NO. SACV 11-00406 DOC (MLGx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING DEFENDANTS DOUGLAS C. MACLELLAN AND AKIO ARIURA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  April 29, 2013<br>Time:  8:30 a.m.<br>Location:  Courtroom 9D<br><br>**ORAL ARGUMENT REQUESTED** |

Hunter Taubman
Weiss LLP

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ……………………………………….................... i

TABLE OF AUTHORITIES...........................................................iii

I.    INTRODUCTION 1

II.   THE UNDISPUTED FACTS    3

    A.   The Parties...........................................................................3

    B.   Radient And Mayo Agree To Collaborate On A Clinical Study For The Validation Of Onko-Sure ..........................................4

    C.   Mayo Clinic Physicians And Other Employees Spend Hundreds of Hours Working On The Clinical Study .............................7

    D.   The January 18, 2011 Press Release Accurately Summarizes The Status Of Radient's Clinical Study With Mayo ...........................8

    E.   The Individual Defendants' Respective Roles in Relation to The January 18, 2011 Press Release.................................…………10

III.  LEGAL STANDARDS    11

IV.   SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE INDIVIDUAL DEFENDANTS BECAUSE THERE ARE NOT ANY GENUINE ISSUES OF MATERIAL FACT TO SUPPORT ANY ELEMENT OF PLAINTIFFS' FIRST CAUSE OF ACTION FOR VIOLATIONS OF SECTION 10(B) AND RULE 10B-5  12

    A.   There Is No Genuine Issue Of Material Fact Regarding The Truth of the January 18 Press Release ..................................13

        1.   Mayo Clinic Was Engaged In A Clinical Study With Radient When The January 18, 2011 Press Release Was Issued ...............................................................14

        2.   Mayo Clinic Did A Lot More Than Just Sell Radient Some Blood Samples.................................................14

        3.   Radient Never Claimed That It Had A "Partnership Agreement" With Mayo Clinic..................................15

        4.   Mayo Clinic Retained The Contractual Right To Publish Study Results First.................................................16

    B.   There Is No Genuine Issue Of Material Fact Regarding Scienter ......16

    C.   There Is No Genuine Issue Of Material Fact Regarding Loss Causation...........................................................................20

Hunter Taubman Weiss LLP

# TABLE OF CONTENTS
## (continued)

**Page**

V.   SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR  OF THE INDIVIDUAL DEFENDANTS BECAUSE THERE ARE NOT ANY GENUINE ISSUES OF MATERIAL FACT TO SUPPORT ANY ELEMENT OF PLAINTIFFS' SECOND CAUSE OF ACTION FOR VIOLATION OF SECTION 20(A) ........................................................................ 21

     A.   There Is No Genuine Issue of Material Fact Regarding A Primary Violation of the Securities Laws ........................................................22

     B.   There Is No Genuine Issue of Material Fact Regarding Mr. Ariura's Actual Power or Control Over Any Primary Violator ........................................................................................................23

     C.   There Is No Genuine Issue of Material Fact That Mr. MacLellan and Mr. Ariura Acted In Good Faith ................................................24

VI.   CONCLUSION.................................................................................25

HUNTER TAubman
WEISS LLP

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

FEDERAL CASES

*Aaron v. SEC*,
  446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) ...................................... 17

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir.2003) ................................................................ 17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............................... 11, 12

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ..................................... 11

*Chevron Corp. v. Pennzoil Co.*,
  974 F.2d 1156 (9th Cir. 1992) ................................................................ 12

*Donohoe v. Consol. Operating & Prod. Corp.*,
  20 F.3d 907(7th Cir. 1994) ..................................................................... 24

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ................................... 20

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) (en banc) .................................................. 7, 22, 24

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ................................................................ 22, 23

*In re Apple Computer Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...................................................... 18

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ................................................................ 18,19

*In re Convergent Tech. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ................................................................ 13

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................ 20

HUNTER TAUBMAN
WEISS LLP

-i-

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Gilead Sciences Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008)................................................................20

*In re Hansen Natural Corp. Sec. Lit.,*
527 F.Supp.2d 1142 (C.D. Cal. 2007)....................................................22

*In re Juniper Networks, Inc.,*
158 Fed. Appx. 899 (9th Cir. 2005) .......................................................13

*In re Live Concert Antitrust Litigation,*
863 F. Supp.2d 966 (C.D. Cal. 2012)......................................................21

*In re Netflix Inc., Sec. Litig.,*
2013 WL 542637 (N.D. Cal. Feb 13, 2013).............................................23

*In re REMEC Inc. Sec. Litig.,*
702 F. Supp.2d 1202 (S.D.Cal. 2010) ...............................................12, 21

*In re Silicon Graphics Inc. Securities Litig.,*
183 F.3d 970 (9th Cir. 1999)...............................................................17,18

*In re Syntex Corp. Sec. Litig.,*
95 F.3d 922 (9th Cir. 1996).....................................................................13

*In re Verifone Holdings, Inc. Sec. Litig,*
704 F.3d 694 (9th Cir. 2012)...................................................................22

*In re Wet Seal, Inc. Secs. Litig.,*
518 F. Supp. 2d 1148 (C.D. Cal. 2007)...................................................17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir.2008).............................................................18, 20

*Musick v. Burke,*
913 F.2d 1390 (9th Cir. 1990) ................................................................11

*Nordstrom, Inc. v. Chubb & Son, Inc.,*
54 F.3d 1424 (9th Cir. 1995)...................................................................19

*Paracor Finance Inc. v. General Electric Capital Corp.,*
96 F.2d 1151 (9th Cir. 1996)...................................................................22

HUNTER TAUBMAN WEISS LLP

1
2

# TABLE OF AUTHORITIES
### (continued)

Page

3
4

*S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,*
   690 F.2d 1235 (9th Cir. 1982) ............................................................... 11

5
6

*Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,*
   552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) ......................... 12

7
8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ...................... 17

9

*United States v. Diebold, Inc.,*
   369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ............................. 12

10
11

FEDERAL STATUTES

12

15 U.S.C. § 78u–4(b)(4) ............................................................................. 19

13

15 U.S.C.S. §78t(a).................................................................................22, 24

14

RULES

15

Fed. R. Civ. Proc. 56(c) ............................................................................. 11

16

Fed. R. Civ. Proc. 56(e) ............................................................................. 11

17
18

REGULATIONS

19

17 C.F.R. § 240.10b-5 ......................................................................1, 12, 17

20
21
22
23
24
25
26
27
28

HUNTER TAUBMAN
WEISS LLP

Defendants Douglas C. MacLellan ("Mr. MacLellan"), and Akio Ariura ("Mr. Ariura") (collectively, the "Individual Defendants"), respectfully submit their Memorandum of Points and Authorities Supporting Their Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment.  In furtherance of the same, the Individual Defendants respectfully state as follows:

## I.    INTRODUCTION

In this securities class action, Plaintiffs Reydel Quintana, Dat Tan Tran, and Agnes Cho, individually and on behalf of all other persons similarly situated (collectively referred to as, "Plaintiffs") allege that Defendant Radient Pharmaceuticals Corporation's ("Radient") January 18, 2011 press release (the "**January 18, 2011 Press Release**") announcing progress in its "clinical study with Mayo Clinic" was false and misleading.  Plaintiffs base their claims against Defendants on a blog article that unscrupulously characterized the January 18, 2011 Press Release as a false exaggeration of Radient's relationship with Mayo Clinic.

The discovery phase of this matter has demonstrated that Radient did, in fact, collaborate on a clinical study with the Mayo Clinic to validate the efficacy of Radient's Onko-Sure® cancer detection test, and Mayo played an extensive and meaningful role in that study.  Mayo Clinic doctors drafted the test protocol for the study.  All of the nearly 1,000 patient blood specimens tested during the course of the clinical study were identified and retrieved from Mayo Clinic archives by Mayo employees.  A Mayo Clinic laboratory conducted fully half of the specimen testing. Mayo Clinic researchers had oversight authority throughout the course of the entire study.  Mayo Clinic's Legal and Public Affairs Departments twice vetted and pre-approved public disclosures made by Radient describing the relationship as a "a clinical study" of Radient's Onko-Sure® test "with Mayo Clinic."  Because the undisputed evidence conclusively establishes that Radient's January 18, 2011 Press Release was true, there is no genuine issue of material fact regarding the first

element of Plaintiffs' 10b-5 claim, and summary judgment should be entered for Radient.

Plaintiffs also cannot offer any evidence that the Defendants acted with the scienter requisite to establish a violation of Section 10 of the Exchange Act and Rule 10b-5.  In the Ninth Circuit, a plaintiff carries the burden of proving that a defendant made an allegedly false or misleading statement either intentionally or with deliberate recklessness.  Deliberate recklessness is not merely simple or even inexcusable negligence, but an <u>extreme</u> departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that he must have been aware of it.  Plaintiffs will never be able to prove that any person acted with that mental state in connection with the issuance of the January 18, 2011 Press Release.  To the contrary, most of the information disclosed by Radient on January 18, 2011 previously had been disclosed to the public in other press releases and SEC filings.  Radient attached to its annual report a copy of its Collaboration Agreement with Mayo, which created and defined the parties' relationship, and disclosed key details about the Clinical Study.  Also, many of the material statements made in the January 18 Press Release had been previously vetted and approved for public disclosure by Mayo itself.  No person attempting to mislead the public regarding the nature of Radient's relationship with Mayo Clinic or the details of the Clinical Study would do any, much less all of these things.

Plaintiffs also cannot prove loss causation.  Their entire loss causation theory is based upon the contention that a supposedly "hidden truth" regarding Radient's relationship with Mayo Clinic was "revealed" in an article published on the *TheStreet.com* website, causing Radient's stock price to immediately collapse.  But the *TheStreet.com* got its facts wrong.  No "truth" was revealed in that article.  A disclosure that does not reveal anything but erroneous information to the market is, by definition, not corrective, and cannot provide a basis for a loss causation theory.

Finally, Plaintiffs cannot establish that either of the Individual Defendants have violated Section 20(a) of the Exchange Act.  First, Plaintiffs cannot establish a primary violation of the federal securities laws.  Moreover, Plaintiffs cannot establish that Mr. Ariura acted as a control person sufficiently to render Section 20(a) applicable to any of his conduct.  Simply put, Plaintiffs' attempts to entangle the Individual Defendants in this matter have failed.

In sum, there is no genuine issue of material fact for any of the elements of Plaintiffs' securities fraud cause of action against Radient or Mr. MacLellan, or for any of the elements of Plaintiffs' Section 20(a) cause of action against the Individual Defendants.  This is a factually baseless case that should be dismissed now on summary judgment, before additional witness, Court and juror time is wasted.

## II.    THE UNDISPUTED FACTS.

### A.    The Parties.

Radient Pharmaceuticals Corporation ("**Radient**") is a Tustin, California based company that develops, manufactures and markets in vitro diagnostic tests for physicians.[1]  Radient's flagship product is a U.S. Food and Drug Administration-approved cancer detection test kit called AMDL-ELISA DR-70, which Radient markets under the brand name "**Onko-Sure®**."  [UF no. 4].  Prior to a shareholder-approved corporate name change on September 25, 2009, Radient was known as "AMDL, Inc."  [UF no. 2].

Defendant Douglas C. MacLellan is, and was at all times relevant to this action, Radient's Chairman and Chief Executive Officer.  [UF no. 5].  Defendant Akiro Ariura is, and was at all times relevant to this action, Radient's Chief Financial Officer.  [UF no. 6].  Non-party Mayo Clinic is a leading medical care and research institution.  [UF no. 7].

---

[1] *See* Separate Statement of Uncontroverted Facts and Conclusions of Law, Uncontroverted Fact ("**UF**") Nos. 1 and 3.

**B.** **Radient And Mayo Agree To Collaborate On A Clinical Study For The Validation Of Onko-Sure.**

In December 2008, Radient entered into a Collaboration Agreement with Mayo Validation Support Services ("**MVSS**"), a wholly owned subsidary of the Mayo Clinic.  [UF nos. 8, 17].[2]  Pursuant to the Collaboration Agreement, MVSS agreed to provide material and services in connection with a clinical study of Onko-Sure® named "Evaluation of AMDL-ELISA DR-70® in Colon Cancer" (hereafter, the "**Clinical Study**").  [UF nos. 18, 21].

The Collaboration Agreement includes a detailed Project Description for the Clinical Study, which sets forth the scope of the study and the respective rights and responsibilities of Radient, MVSS and Mayo Clinic physicians.[3]  Key provisions of the Collaboration Agreement and Clinical Study included the following:

- Mayo Clinic physicians would develop a written protocol for the Clincal Study (the "**Protocol**"), and obtain approval of the Protocol from Mayo Clinic's Institutional Review Board;

- Mayo Clinic physicians would maintain oversight control over the Clinical Study through its completion;

- MVSS would identify approximately 1,000 patient specimens appropriate for the Clinical Study, with a mix of specimens from patients with colon cancer at six different stages of disease progression;

- MVSS would pull those specimens, the annotated patient information associated with each specimen from its specimen archives, and create a study database;

---

[2]  A true and correct copy of the Collaboration Agreement is submitted as Ex. C to the Joint Declaration of Robert D. Weber and Mark David Hunter ("**Joint Decl**.")
[3]  UF no. 20; *see also* Collaboration Agreement Exhibit A-1 [Joint Decl. Ex. C, pp. RW-45 to RW-48].

- MVSS would aliquot the specimens for testing by Radient,[4] and then ship those portions to Radient;

- Radient would perform the Onko-Sure® testing upon the specimens provided by MVSS;

- Radient would provide any data it generated in connection with the Clinical Study back to the Mayo Clinic investigators for potential publication; and,

- Mayo Clinic reserved the right of first refusal to publish the results of the Clinical Study and also reserved the option to license Onko-Sure® for use in the Mayo practice and Mayo Medical Laboratories.

*See* Collaboration Agreement § 1.3(b) and Exhibit A-1 [Joint Decl. Ex. C, pp. RW-38 and RW- 45 to RW-48].

Shortly after the Collaboration Agreement was executed, Radient issued a press release announcing that it "has entered into a collaborative agreement ***with Mayo Clinic to conduct a clinical study*** for the validation of" Onko-Sure®.  [UF no. 47; Joint Decl. Ex. R, p. RW-329 (emphasis added)].  Before that press release was issued, Mayo Clinic's Public Affairs Department reviewed a draft and approved the specific language that Radient used to describe the nature of the relationship between Mayo Clinic and Radient.  [UF no. 48].  In May 2010, the entire Collaboration Agreement itself was published to the public when it was filed with the SEC as an exhibit to Radient's Form 10-K/A.  [UF no. 27; Joint Decl. Ex. Q, at pp. RW-312 to RW-324].

Before the Protocol for the Clinical Study was finalized and testing commenced, Mayo and Radient agreed to add an additional component to the study design.  Specifically, the parties agreed that Mayo Clinic laboratories would, in parallel with the testing being performed by Radient using Onko-Sure® test kits, perform testing upon portions of the same samples using a different cancer test called the Carcinoembryonic Antigen test ("**CEA**").  [UF no. 29].  CEA is a cancer

---

[4]  "Aliquot" means dividing a sample into a defined volume for testing purposes.

1  diagnostic test that was approved by the FDA thirty years ago and competes with

2  Onko-Sure® in the marketplace.  [UF no. 28].  With this change to the study

3  design, a portion of each identified specimen was provided to Mayo Clinic's lab,

4  which tested its portions using CEA, and an equal portion of each specimen was

5  provided to Radient's lab, which tested its portions using Onko-Sure®.  [UF no.

6  28].  At the conclusion of the parallel testing, the efficacy of the two different tests

7  upon each specimen could be compared.

8         Mayo and Radient executed a written change order in May 2010 that added

9  the CEA testing component to the Clinical Study design.  [UF no. 29].  Mayo Clinic

10 physicians and other personnel, in collaboration with Radient personnel, drafted

11 and completed a written protocol for the Clinical Study which included the

12 modified design.  [UF no. 30].  Mayo Clinic researchers Dr. Lisa Boardman and

13 Dr. Stephen Thibodeau, and MVSS Manager Linda Sanders, contributed to the

14 drafting of the Protocol.  [UF no. 31].  The Mayo Clinic Institutional Review Board

15 ("**IRB**")[5] reviewed and approved the Protocol for the Clinical Study in July 2010.

16 [UF no. 35].  The Protocol expressly states that an "objective of the collaboration is

17 to validate [Onko-Sure®] as an aid in monitoring the disease status in patients."

18 [UF no. 32; Protocol, Joint Decl. Ex. D., p. RW-52].

19        Following the Change Order and approval of the Protocol by Mayo's IRB,

20 Radient issued another press release updating the public regarding the status of its

21 Clinical Study with Mayo.  [UF no. 50].  As with the initial press release regarding

22 the Clinical Study, Mayo Clinic's Public Affairs and Legal Departments reviewed

23 the press release and approved of its contents prior to publication.  [UF no. 51].  In

24 language approved by Mayo Clinic, the August 31, 2010 press release disclosed

25 that Radient "has resumed collaborations with Mayo Collaborative Services, Inc. to

26

27 _____
[5]  The Mayo Clinic's Institutional Review Board is a group of Mayo Clinic physicians and other Mayo employees that has the responsibility to review and approve clinical studies to ensure that they meet federal regulations and Mayo Clinic standards for research.  [UF no. 34].

28

conduct a clinical study for the validation of RPC's FDA-approved Onko-Sure® in vitro diagnostic (IVD)" cancer test . . . ." [*See* Joint Decl. Ex. F, p. RW-60]. The press release approved by Mayo also noted the modified study design by disclosing that "[o]ver 1,000 colorectal patient samples with various disease stages will be tested in parallel by RPC and Mayo Clinic to directly compare the results of the Onko-Sure® test with the with the Carcinoembryonic Antigen (CEA) test." *Id.*

## C.  Mayo Clinic Physicians And Other Employees Spend Hundreds of Hours Working On The Clinical Study

Mayo and Radient proceeded to perform the Clinical Study tasks agreed upon in the Collaboration Agreement, Change Order and Protocol.  Mayo assigned project managers whose responsibilities included coordination of specimen transfer to Mayo's and Radient's laboratories, transfer of Mayo's testing results to Radient, and updating Radient's and Mayo's investigators regarding progress of the Clinical Study.  [UF nos. 10-12].  Mayo Clinic conducted its specimen testing assignment over roughly five weeks in late 2010.  [UF nos. 38-39].  The Mayo Clinic automated immunoassay laboratory tested 983 patient samples in connection with the Clinical Study.  [UF no. 37].  Mayo Clinic completed its specimen testing on or about December 30, 2010, and on that date its project manager for the Clinical Study, Laura Hanson, e-mailed Mayo's initial testing results to Radient.  [UF nos. 11, 39].  MVSS personnel spent 836 hours working on the Clinical Study, and those hours involved only developing the study design, identifying specimens for testing and other tasks, but none of the actual testing.  [UF nos. 45, 46].  The actual testing was performed by employees of Mayo Clinic's automated immunoassay laboratory. [UF no. 46].  Records of the precise number of hours spent by lab technicians running testing for the Clinical Study were not maintained (*id.*), but considering that the lab needed five weeks to test nearly 1000 patient samples, the number of

hours likely was not insignificant.  Mayo Clinic shipped residual specimen samples to Radient in February 2011.  [UF no. 40].

Radient tested its portions of the specimens selected for the Clinical Study during the first quarter of 2011.  [UF no. 41].  Radient completed its specimen testing on March 4, 2011.  [UF no. 42].  Radient provided its test results to Mayo on April 14, 2011.  [UF no. 44].

**D.**   **The January 18, 2011 Press Release Accurately Summarizes The Status Of Radient's Clinical Study With Mayo.**

Shortly after the Mayo Clinic lab completed its testing on the portions of the nearly 1,000 specimens for which it was responsible, Radient issued the January 18, 2011 Press Release, reporting the progress of the Clinical Study as of that date. The January 18 Press Release stated in pertinent part:

> Radient Pharmaceuticals Corporation (AMEX:RPC - News), a US-based company specializing in the research, development, and international commercialization of In Vitro Diagnostic cancer tests, announced today progress on its clinical study with Mayo Clinic ("Mayo") for the validation of the Company's US FDA-cleared Onko-Sure® in vitro diagnostic (IVD) cancer test as a useful tool in the detection of colorectal cancer in all stages of CRC, especially early stages where effective diagnosis leads to better patient prognosis.  Based on recent advancements, RPC anticipates it will complete the clinical trial with Mayo in the first quarter of 2011.
>
> The clinical trial represents the largest study conducted to date for RPC's Onko-Sure® IVD cancer test. Approximately 1,000 colorectal patient samples with various disease stages are being tested in parallel by RPC and Mayo to directly compare the efficiency of the Onko-Sure® test with the Carcinoembryonic Antigen (CEA) test.  Patients with confirmed clinical diagnoses are tested across six clinically distinct patient groups . . .
>
> Topline goals of the study include: (1) validation of the overall effectiveness of Onko-Sure® for the detection of colorectal cancer as compared with normal and benign

controls; (2) assessing the efficiency of Onko-Sure® in each independent colorectal cancer stage; (3) assessing the overall efficiency of RPC's Onko-Sure® IVD test as compared with that of the CEA test; and (4) comparing the stage-specific efficacy of Onko-Sure® versus CEA; especially early cancer stages….

A copy of the January 18 Press Release is attached as Ex. J to the Joint Decl.

All of the above statements were undeniably truthful at the time they were made. Radient was at the time participating in a clinical study with Mayo Clinic concerning the validation of Onko-Sure®. [UF no. 57]. Progress on the Clinical Study had been made recently; namely, Mayo Clinic had completed its testing three weeks prior. [UF no. 57]. As of January 18, 2011, Radient did in fact anticipate that it would complete the Clinical Study during the first quarter of 2011. [UF no. 58]. The Clinical Study was the largest study that Radient conducted concerning Onko-Sure®. [UF no. 59]. Approximately 1,000 colorectal patient samples, that represented six clinically distinct patient groups with various disease stages, were being tested in parallel by Radient and Mayo in connection with the Clinical Study. [UF no. 60]. And all of the "top line goals" of the Clinical Study articulated in the January 18, 2011 Press Release were, in fact, ultimately achieved. [UF nos. 61-64].

Just as significantly, almost all of the material statements in the January 18, 2011 Press Release were consistent with information about the Clinical Study previously disclosed to the public by Radient. The accuracy of Radient's description of its relationship with Mayo Clinic in the January 18, 2011 Press Release is buttressed by the fact that Mayo Clinic's Public Affairs and Legal Departments had previously approved public statements essentially identical to the material statements made in the January 18, 2011 Press Release, as can be seen in the table below:

HUNTER TAUBMAN
WEISS LLP

-9-

| Statement Earlier Approved By Mayo | Statement in Jan. 18 Press Release |
|---|---|
| "[Radient] announced today it has entered into a Collaborative Agreement **with Mayo Clinic** to conduct a clinical study for the validation of [Onko-Sure®]."[6] | [Radient] announced today progress on its clinical study **with Mayo Clinic** ("Mayo") for the validation of the Company's US FDA-cleared Onko-Sure® in vitro diagnostic (IVD) cancer test |
| "Over 1,000 colorectal patient samples with various disease stages will be tested in parallel by RPC and Mayo Clinic to directly compare the results of the Onko-Sure® test with the with the Carcinoembryonic Antigen (CEA) test."[7] | "Approximately 1,000 colorectal patient samples with various disease stages are being tested in parallel by RPC and Mayo to directly compare the efficiency of the Onko-Sure® test with the Carcinoembryonic Antigen (CEA) test." |
| "The primary goal of the study is to determine whether Onko-Sure® is more effective than CEA at detecting early stage colorectal cancers."[8] | "Topline goals of the study include . . . assessing the overall efficiency of RPC's Onko-Sure® IVD test as compared with that of the CEA test [and] comparing the stage-specific efficacy of Onko-Sure® versus CEA, especially early cancer stages." |

On March 7, 2011, an article published on the *TheStreet.com* website implied, in ignorance of the evidence summarized above, that Radient was "exaggerating" the extent of its relationship with the Mayo Clinic.[9]  Plaintiffs contend that this incorrect media report caused the market price of Radient's stock to decline 26% in one day.  *Id.*

### E.   The Individual Defendants' Respective Roles in Relation to the January 18, 2011 Press Release

Radient's CEO Mr. MacLellan had ultimate authority for approving the January 18, 2011 Press Release, and for its dissemination.  [UF no. 68].  Mr. Ariura's only role in the preparation of the January 18, 2011 Press Release was his provision of general grammatical comments upon a draft.  [UF no. 69].  Mr. Ariura

---

[6]  *See* UF nos. 48, 49 and Joint Decl. Ex. R.

[7]  *See* UF nos. 50, 51 and Joint Decl. Ex. G.

[8]  *Id.*

[9]  *See* Amended Complaint at ¶ 39 [Joint Decl. Ex. A, p. RW-14].

did not have the authority to stop, approve, or ultimately demand changes to a press release.[10]

## III.    LEGAL STANDARDS

Summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact.  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial."  Fed. R. Civ. Proc. 56(e); *see also Anderson*, 477 U.S. at 248-49, 106 S.Ct. 2505.  A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548.  A party cannot create a genuine issue of material fact simply by making assertions in its legal papers; there must be specific, admissible evidence identifying the basis for the dispute.  *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

---

[10]  Joint Decl. Ex. O, p. RW-164 to RW-165.

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). But by the same token, "Defendants should not endure an expensive trial when no reasonable jury could conclude that Plaintiffs have proven their case." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp.2d 1202, 1250 (S.D.Cal. 2010). Where a plaintiff does not offer "concrete evidence from which a jury might return a verdict in his favor," it is not sufficient to merely assert "the jury might, and legally could, disbelieve the defendant's denial of [deceitful intent]." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Id.*, 477 U.S. at 252, 106 S.Ct. 2505.

## IV. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE INDIVIDUAL DEFENDANTS BECAUSE THERE ARE NOT ANY GENUINE ISSUES OF MATERIAL FACT TO SUPPORT ANY ELEMENT OF PLAINTIFFS' FIRST CAUSE OF ACTION FOR VIOLATION OF SECTION 10(B) AND RULE 10B-5.

The elements of a Section10(b) private action are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).[11] The Plaintiffs here cannot present evidence to support any one of these elements. The Individual Defendants will focus below specifically upon Plaintiffs' lack of evidence regarding falsity, scienter and loss causation.

---

[11]  Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240, Rule 10b–5.

A.     **There Is No Genuine Issue Of Material Fact Regarding The Truth of the January 18 Press Release**.

In a securities fraud case like this one, "[l]iability depend[s] on the plaintiffs' success in demonstrating that one of the statements made by the company was actually false or misleading." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991). "Thus, to prevail, the plaintiffs must demonstrate that a particular statement, *when read in light of all the information then available to the market*, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.* (emphasis added). Moreover, for a statement to be actionable, the evidence must show that the statement was false or misleading at the time it was made. *See In re Juniper Networks, Inc.*, 158 Fed. Appx. 899, 900 (9th Cir. 2005) ("However, the [Complaint] does not specific facts establishing that the [statement] was false when made."); *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996).

Plaintiffs assert that the January 18, 2011 Press Release was materially false and misleading on the date when it was issued for four reasons: (1) "the Mayo Clinic was not engaged in clinical studies with Radient;" (2) "the Mayo Clinic's only relationship with Radient was a contract between Radient and a subsidiary of the Mayo Clinic that sold blood and tissue samples for Radient's clinical trial;" (3) "the Mayo Clinic did not have a partnership agreement with Radient;" and, (4) "the Mayo Clinic was not to provide any clinical study results about Onko–Sure."[12] Summary judgment should be granted in the Individual Defendants' favor, because Plaintiffs cannot produce evidence to prove any of these allegations, and the evidence obtained during discovery actually disproves Plaintiffs' falsity theory.

---

[12]   Amended Complaint ¶¶ 15, 38 [Joint Decl. Ex. A, pp. RW-5 and RW-12].

### 1. Mayo Clinic Was Engaged In A Clinical Study With Radient When The January 18, 2011 Press Release Was Issued.

The evidence establishes beyond a shadow of doubt that Mayo Clinic collaborated with Radient on a Clinical Study to validate the efficacy of Onko-Sure. [UF nos. 9, 17-46]. Mayo's material role in that Clinical Study is evidenced by the Collaboration Agreement, Change Order, written Protocol for the study (on Mayo Clinic letterhead), the initial results provided from Mayo Clinic's laboratory on December 30, 2010, and the testimony of Mayo Clinic's project manager for the Clinical Study. *Id.* It also is established that the Clinical Study was ongoing when Radient issued its press release on January 18, 2011; Mayo had just completed its testing phase less than three weeks prior, Radient was continuing to test samples in its labs, and analysis of the results and potential publication was still in the future. [UF nos. 24, 25, 41, 44 and 57].

### 2. Mayo Clinic Did A Lot More Than Just Sell Radient Some Blood Samples.

Plaintiffs' allegation that "Mayo Clinic's only relationship with Radient was a contract between Radient and a subsidiary of the Mayo Clinic that sold blood and tissue samples for Radient's clinical trial," is completely and objectively false.[13] As outlined above, Mayo Clinic doctors and other employees spent hundreds (perhaps over a thousand) hours performing numerous services in connection with the Clinical Study. [UF nos. 18, 22, 29-40, 45-46]. During her deposition, Mayo's project manager for the Clinical Study Laura Hanson [UF no. 11] neatly dispatched this particularly spurious claim of Plaintiffs, by testifying as follows:

> Q. -- in connection with the collaboration with Radient, Mayo did more than just provide biospecimens; right?
>
> A. Mayo Clinic provided biospecimens, associated data,

---

[13] Amended Complaint ¶¶ 15, 38 [Joint Decl. Ex. A, pp. RW-5 and RW-12].

Hunter Taubman Weiss LLP

1    and completed CEA testing.

2    Q.    Okay. That's more than just providing specimens; right?

3    A.    Yes.

4    Q.    And Mayo did those things which you just described

5          in connection with a clinical study of the DR-70 product; right?

6    A.    Yes.

7          * * *

8    Q.    And doctors from the Mayo Clinic worked on this

9          clinical study; right?

10   A.    Yes.

11   Q.    And employees of Mayo Clinic worked on this

12         study; right?

13   A.    Yes.

*See* Excerpts from Hanson Depo. at pp. 60:11 – 61:12 [Joint Decl. Ex. K at

pp. RW-101A-B].

### 3.    Radient Never Claimed That It Had A "Partnership Agreement" With Mayo Clinic.

Plaintiffs also argue that the January 18 Press Release was misleading

because "the Mayo Clinic did not have a partnership agreement with Radient."[14]

But Radient never said it had a partnership agreement with Mayo Clinic.  The

January 18, 2011 Press Release does not use the word "partnership" anywhere.

[*See* Joint Decl. Ex. J].  Further, Radient never claimed that it had any sort

"partnership agreement" with Mayo Clinic in any other document.  [UF no. 67].  To

the contrary, Radient published the Collaboration Agreement itself, one provision

of which expressly states that the relationship between Radient "and the Mayo

Physicians hereunder shall be that of independent contractors.  ***Nothing in this***

---

[14]   Amended Complaint ¶¶ 15, 38 [Joint Decl. Ex. A, pp. RW-5 and RW-12].

*Agreement shall be construed as creating a partnership*, . . ." *See* Collaboration Agreement § 10.1 [Joint Decl. Ex. C, p. RW-42] (emphasis added).

In light of the total mix of public information available about Radient's relationship with Mayo Clinic, and the words actually used in the January 18, 2011 Press Release, no reasonable person could infer that Radient was claiming it had a "partnership agreement" with Mayo Clinic.

### 4. Mayo Clinic Retained The Contractual Right To Publish Study Results First.

Lastly, Plaintiffs' theory that the January 18 Press Release was false because "the Mayo Clinic was not to provide any clinical study results about Onko–Sure" [15] is not supported by the actual evidence. The allegation fails for two reasons.

First, the January 18, 2011 Press Release does not state that Mayo Clinic would be publishing results from the Clinical Study. [*See* Joint Decl. Ex. J]. Indeed, the January 18, 2011 Press Release is notably silent on the issue of potential future publication of study results, as compared with earlier disclosures that the Company made. For example, Radient's August 31, 2010 press release—with language approved by Mayo Clinic—said that "data generated will be provided to Mayo physicians and investigators for publication in medical journals." [*See* Joint Decl. Ex. F]. The January 18, 2011 Press Release, by contrast, does not say anything about who would be publishing study results.

Second, as of January 18, 2011, Mayo retained a right to be the first to publish any results from the Clinical Study, had not yet determined whether or not it would publish results (because results had yet to be determined), and Defendants had no idea whether or not Mayo Clinic would decide to publish results from the Clinical Study in the future. [UF nos. 25, 41, 44]. Later, Mayo elected not to publish.

---

[15] *Id.*

In sum, none of the four reasons given by Plaintiffs for why the January 18, 2011 Press Release is misleading pan out, because all of the evidence actually is contrary to Plaintiffs' claims.  Since there is no genuine issue regarding the truth of the January 18, 2011 Press Release, Plaintiffs cannot prove the falsity element of their 10b-5 cause of action and summary judgment should be granted in favor of the Individual Defendants.

### B.   There Is No Genuine Issue Of Material Fact Regarding Scienter.

Violations of Section 10(b), and Rule 10b-5 require scienter. *See Aaron v. SEC*, 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).  The Supreme Court has explained that scienter for purposes of § 10(b) and Rule 10b–5 is "the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007). To satisfy this standard, a plaintiff must show that a defendant acted intentionally or with "deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). The Ninth Circuit has held that "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. Deliberate recklessness is "conduct [that] may defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc).  To establish a corporation's scienter, the mental state of an officer acting on the corporation's behalf may be imputed to it.  *See, e.g., Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003) (scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b–5).

1   Plaintiffs here cannot offer any evidence to show that any Radient officer or

2   employee – particularly Mr. MacLellan or Mr. Ariura – engaged in conduct

3   constituting an intentional concealment of material facts or an "an extreme

4   departure from the standards of ordinary care."  Indeed, this Court previously

5   dismissed Plaintiffs' 10b-5 claim asserted against Mr. Ariura, because Plaintiffs

6   could not identify any misleading statement he made.

7   As to Mr. MacLellan, several important pieces of evidence actually negate

8   any inference that he acted with scienter.  Evidence indicative of a pattern of overall

9   conduct inconsistent with scienter will dispel remote inferences of wrongdoing.

10   *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989).

11   First, Mr. MacLellan did not sell a single one of the 446,000 Radient shares

12   that he held during the Class Period.[16]   Mr. MacLellan suffered a significant loss

13   when the market price of Radient stock declined.  An inference of scienter is

14   negated when there is an absence of stock sales or where such sales are minimal.  *In*

15   *re Apple*, 886 F.2d at 1117 (holding that despite sales of $84 million in shares, the

16   defendants still retained such a large percentage of their holdings (92%) that an

17   inference of scienter was functionally negated); *In re Silicon Graphics*, 183 F.3d at

18   987-88 (no scienter where despite over $13.8 million in stock sales, the defendants

19   still retained over 90% of their holdings); *In re Wet Seal, Inc. Secs. Litig.*, 518 F.

20   Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) ("while allegations of insider sales are not

21   required in securities fraud cases, the lack of any tangible, personal benefit here

22   further weighs against the Officer Defendants having scienter") (internal citations

23   omitted).  This is because, logically, a person committing a fraud must have some

24   motive for doing so, such as financial gain.  When a person suffers personal

25   financial loss from an alleged scheme, rather than profiting from the scheme,

26

27

28   [16]   *See* Radient's Schedule DEF14A, filed with the SEC on November 12, 2010 Joint Decl. Ex. U, p. RW-414].

1   Courts typically view that behavior as negating any implication that the person

2   intended to commit fraud.

3        Second, Mr. MacLellan repeatedly disclosed the details of the Clinical Study

4   to investors, in great detail.  The entire Collaboration Agreement was attached to an

5   annual report that he signed.  [UF no. 27; Joint Decl. Ex. Q, pp. RW-310 to RW-

6   325].  He was quoted in all three press releases issued by Radient regarding the

7   Clinical Study.  Someone trying to deceive the public about the nature of Radient's

8   relationship to Mayo Clinic would not go out of his way to provide detailed

9   information about that relationship.

10        Third, the Mayo Clinic repeatedly approved Radient's public release of

11   statements describing the nature of its collaboration with Radient in language

12   virtually identical to the January 18, 2011 Press Release language which Plaintiffs

13   claim was "misleading."  [UF nos. 47-48, 50-51].  Discovery in this matter has

14   completely undermined any notion that Mr. MacLellan tried to mislead the public

15   about Radient's relationship to Mayo Clinic by including statements in the January

16   18, 2011 Press Release similar to those that Mayo Clinic previously had vetted and

17   approved.

18        Because there is no evidence that any Radient officer or employee acted with

19   the requisite scienter, there likewise can be no finding that the corporate defendant

20   Radient acted with scienter.  "A defendant corporation is deemed to have the

21   requisite scienter for fraud only if the individual corporate officer making the

22   statement has the requisite level of scienter."  *In re Apple Computer Sec. Litig.*, 243

23   F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) (citing *Nordstrom, Inc. v. Chubb & Son,*

24   *Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995)).  Thus, scienter is another element of a

25   10b-5 cause of action that Plaintiffs cannot prove, providing another basis for

26   summary judgment to be granted in favor of the Individual Defendants.

27

28

**C.      There Is No Genuine Issue Of Material Fact Regarding Loss
Causation.**

Plaintiffs also cannot establish loss causation.  Loss causation is the causal
connection between the defendant's material misrepresentation and the plaintiff's
loss.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th
Cir.2008) (*citing Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342, 125
S.Ct. 1627 (2005).  "A plaintiff bears the burden of proving that a defendant's
alleged unlawful act 'caused the loss for which the plaintiff seeks to recover
damages.'"  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)
(*quoting* 15 U.S.C. § 78u–4(b)(4)).  Put another way, "[t]o establish loss causation,
'the plaintiff must demonstrate a causal connection between the deceptive acts that
form the basis for the claim of securities fraud and the injury suffered by the
plaintiff.'"  *Id.*  (*citing In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005));
*see also Metzler*, 540 F.3d at 1063 (the plaintiff must show that "the practices that
the plaintiff contends are fraudulent were revealed to the market and caused the
resulting losses").

Thus to prove loss causation, Plaintiffs must show that Radient's stock price
dropped when the market learned the "relevant truth"-that is, a "truth" that
Defendants had concealed from the market through their alleged false statements.
Plaintiffs may do so either by showing that the "relevant truth" was revealed
directly, through a disclosure of facts that had been previously concealed, or
indirectly, through a disclosure that the market understood to reveal the previously
concealed facts. *Metzler Inv.*, 540 F.3d at 1064.

Plaintiffs here base their loss causation claim on the theory that "the
materially misleading and false nature of the Company's January 18, 2011 press
release" was directly revealed in the March 7, 2011article published by
*TheStreet.com.  See* Amended Complaint at ¶ 39, 40 [Joint Decl. Ex. A, p. RW-13].

1  Immediately following publication of that article, the price of Radient stock

2  dropped 26%. *Id.*

3  But Plaintiffs cannot prove loss causation for the simple reason that the *The*

4  *Street.com* article did not actually reveal any "concealed truth" regarding the nature

5  of Radient's relationship to Mayo.  The lede of the article—an assertion that

6  Radient was not engaged in a Clinical Study with Mayo Clinic—was flat out

7  wrong.  The article's additional allegation that Radient was "exaggerating" Mayo's

8  involvement with the Clinical Study also is contrary to the actual facts [UF nos. 18,

9  22, 29-40, 45-46].  Thus, there is no evidence that on March 7, 2011 a previously

10  "concealed truth" about Radient's relationship with Mayo was revealed.

11  In the context of a summary judgment motion, failure to establish that the

12  disclosure of the relevant wrongdoing played a significant role in a loss merits entry

13  of summary judgment for failure to show loss causation.  *In re REMEC*, 702 F.

14  Supp.2d at 1266.  "A 'corrective disclosure' is a disclosure that reveals the fraud, or

15  at least some aspect of the fraud, to the market." *In re Live Concert Antitrust*

16  *Litigation*, 863 F. Supp.2d 966, 977 n. 7 (C.D. Cal. 2012).  It stands to reason then

17  that "[a] disclosure that does not reveal anything new to the market is, by definition,

18  not corrective.'" *In re REMEC*, 702 F. Supp.2d at 1267.

19  A third party's publication of an erroneous report does not establish that the

20  Defendants caused Plaintiffs' alleged losses, and accordingly, Plaintiffs cannot

21  prove the loss causation element of their 10b-5 claim.

22

23  **V.    SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF THE INDIVIDUAL DEFENDANTS BECAUSE THERE ARE NOT ANY GENUINE ISSUES OF MATERIAL FACT TO SUPPORT ANY ELEMENT OF PLAINTIFFS' SECOND CAUSE OF ACTION FOR VIOLATION OF SECTION 20(A).**

24

25

26  Plaintiffs failed to provide any evidence to establish their claims alleging

27  violations of Section 20(a) of the Exchange Act against the Individual Defendants.

28

Section 20(a) provides that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C.S. §§ 78a et seq.] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable… unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C.S. § 78t(a) (2010).  Thus, a successful prima facie case under Section 20(a) alleges "(1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator . . ." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also In re Hansen Natural Corp. Sec. Lit.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007).

Plaintiffs have not established a primary violation of the underlying securities violations and have not presented facts to show that Mr. Ariura exercised any level of control over the January 18, 2011 Press Release.  Further, the Individual Defendants have established that they acted in good faith in any direct or indirect act relating to the January 18, 2011 Press Release.

### A.    There Is No Genuine Issue of Material Fact Regarding A Primary Violation of the Securities Laws

Plaintiffs alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 against Radient and Mr. MacLellan.  However, the record in this matter has conclusively established that no such violations have taken place.  To establish control person liability under Section 20(a) of the Exchange Act, Plaintiffs are required to establish that a primary violation of the securities laws was committed and that the Individual Defendants controlled the primary violator, either directly or indirectly.  *See Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.2d 1151, 1161 (9th Cir. 1996) (see also *Hollinger v. Titan Capital Corp.,* 914 F.2d at 1575, *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991)).  Since Plaintiffs have not established a primary violation of the securities laws, Plaintiffs'

Section 20(a) allegations must fail, and this matter is ripe for summary judgment. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 711 (9th Cir. 2012) ("Section 20(a) claims must be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)")); *see also In re Netflix, Inc., Sec. Litig.*, 12-00225 SC, 2013 WL 542637 (N.D. Cal. Feb. 13, 2013) (Absent an underlying violation of the Exchange Act, there can be no control person liability under Section 20(a).).

**B.   There Is No Genuine Issue of Material Fact Regarding Mr. Ariura's Actual Power or Control Over Any Primary Violator**

Plaintiffs' Amended Complaint states that the Individual Defendants influenced and controlled "the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading." Amended Complaint at ¶67.  The Amended Complaint also states that the Individual Defendants are "presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged . . ." Amended Complaint at ¶68.

Discovery in this matter, however, has established that Plaintiffs' general assertions are inapplicable to Mr. Ariura.  As noted herein, Mr. MacLellan had ultimate authority for approving the January 18, 2011 Press Release, and for its dissemination.  Mr. Ariura's only role in the preparation of the January 18, 2011 Press Release was his provision of general grammatical comments upon a draft. Mr. Ariura did not have the authority to stop, approve, or ultimately demand changes to a press release.  Since no evidence in this matter establishes that Mr. Ariura controlled the contents or distribution of the January 18, 2011 Press Release, and Plaintiffs' sole cause of action against him must fail as a matter of law.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 (9th Cir. 2000) (Court granted summary judgment to officer of company who did not supervise or have any responsibility for the content of the company's documents).

**C.** **There Is No Genuine Issue of Material Fact That Mr. MacLellan and Mr. Ariura Acted in Good Faith**

Even if Plaintiffs were able to establish that the Individual Defendants were controlling persons, the Individual Defendants can still avoid liability by establishing that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). *See Hollinger,* 914 F.2d at 1575. As demonstrated herein, the Individual Defendants lacked the requisite scienter for Plaintiffs to establish a primary violation of the securities laws, as it relates to the January 18, 2011 Press Release.

A defendant's good faith can also be established by a reliance on sources with a record of reliability. *See Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994) (Court granted summary judgment in favor of defendants who were "required to rely heavily" on technical expertise and had no "reason to believe that the sources to whom they looked [to] would prove unreliable"). The record clearly establishes that Mr. MacLellan relied in good faith on Mayo Clinic's Public Affairs and Legal Department's previous approval of Radient's public statements in drafting and approving the January 18, 2011 Press Release and that Mr. Ariura had no involvement in the approval and/or dissemination of the January 18, 2011 Press Release at all.

The parties in the above-captioned matter have exchanged a few thousand pages of discovery and conducted many hours of deposition testimony, yet there have not been any facts established to evidence either a primary violation of the federal securities laws or that either Mr. MacLellan or Mr. Ariura violated Section 20(a) of the Exchange Act.

HUNTER TAUBMAN
WEISS LLP

-24-

## VI.   CONCLUSION

For the foregoing reasons, Defendants Douglas MacLellan and Akio Ariura respectfully requests that the Court grant their motion and enter summary judgment against Plaintiffs.

Dated:        April 1, 2013
              Coral Gables, Florida

                                        Respectfully submitted,

                                        /s/ Mark David Hunter_____

                                        Mark David Hunter, Esquire
                                        *Admitted Pro Hac Vice*
                                        Hunter Taubman Weiss LLP
                                        255 University Drive
                                        Coral Gables, Florida 33134
                                        Tel:  (305) 629-8816
                                        Fax:  (305) 629-8877
                                        E-Mail:  mdhunter@htwlaw.com