O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| VINH NGUYEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RADIENT PHARMACEUTICALS CORPORATION, DOUGLAS C. MACLELLAN, and AKIO ARIURA,<br><br>Defendants. | Case No.: SA CV 11-0406 DOC(MLGx)<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKTS. 72 & 73)** |

Before the Court are two Motions for Summary Judgment brought by Defendants Radient Pharmaceuticals Corporation ("Radient") (Dkt. 72) and by Defendants Douglas C. MacLellan ("MacLellan") and Akio Ariura ("Ariura") (Dkt. 73). After considering all papers filed and oral argument, the Court DENIES Radient's Motion and DENIES MacLellan & Ariura's Motion in part and GRANTS that Motion in part, as to Section 20(a) liability for Ariura only.

## I.      Introduction

Lead Plaintiffs Reydel Quintana, Dat T. Tran, and Agnes Cho ("Plaintiffs") filed the operative Amended Complaint (Am. Compl., Dkt. 14) in this case on July 8, 2011.  They allege two causes of action on behalf of all persons and entities who purchased the common stock of Radient from January 18, 2011 through March 4, 2011 (the Class Period).[1]  Am. Compl. ¶ 1.

The first cause of action is a violation of Section 10(b) of the Securities and Exchange Act of 1934 ("the Exchange Act") and SEC Rule 10b-5.  The second cause of action claims that officers of Radient are liable as control persons of the company under Section 20(a) of the Exchange Act.  Plaintiffs sued Radient, Radient's Chairman of the Board and CEO, MacLellan (MacLellan), and Radient's CFO, Ariura  (collectively referred to as Defendants).

After a round of Motions to Dismiss, the remaining claims at the summary judgment stage are Section 20(a) claims as to Ariura and MacLellan, and Section 10(b) and Rule 10b-5 claims as to MacLellan and Radient.

## II.     Factual Background[2]

Radient is a small company whose main business is the research, development, manufacture, and sale of a colorectal cancer detection test kit marketed under the name Onko-Sure.  DF 4; PF 5, 7. The predominant test used to detect colorectal cancer is the Carcinoembryonic Antigen ("CEA") marker test. PF 23.

<u>Financial Challenges for Radient</u>

It has been a challenge for Onko-Sure to made headway against the CEA test: in 2010, the year prior to the Class Period, Radient made $231,662 in revenue, had operating expenses of more than $14 million, and ended with a net loss of about $85 million. PF 72. In the first quarter

---

[1] The Class excludes Defendants, along with the present and former officers and directors of Radient and any of its subsidiaries, their immediate families, and their "legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest." This Court certified the class on November 26, 2012 (Dkt. 65).

[2] Defendants submitted a Separate Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 72-2) ("DF"). Plaintiffs filed a Statement of Genuine Disputes of Material Fact (Dkt. 78) ("PF"), as well as a Response to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law. Defendants filed joint responses to PF (Dkt. 81-1) ("Reply PF"), as well as a Response to Plaintiffs' Response to DF (Dkt. 81-2) ("Reply DF").

of 2011, which includes the Class Period, Radient earned $30,655 in revenue and had about $11.4 million in losses. PF 74. Radient's independent auditor issued a "going concern" qualification in its audit opinion for Radient for 2010, noting that Radient's financial figures "raise substantial doubt about the Company's ability to continue as a going concern." PF 73. Radient had funded operations in prior years by selling debt and securities; it closed ten debt and equity financings for about $12 million total from September 2008 to the beginning of the Class Period. PF 75. In 2010, Radient used its common stock to pay for services. PF 79.[3]

Collaboration Agreement

In December 2008, Radient[4] and Mayo Validation Support Services ("MVSS") entered into an agreement titled "Collaboration Agreement."  DF 17. MVSS is a service line within Mayo Collaborative Services, Inc. DF 7-8. Mayo Collaborative Services is a company wholly owned by the Mayo Clinic, a renowned medical care and research institution. *Id*. MVSS holds tissue and blood specimens and, through a subcontract with the Mayo Clinic, had services for preparing and testing specimens. Collaboration Agreement at 1 (hereafter "Agreement"), Ex. C to Joint Declaration of Robert D. Weber and Mark David Hunter in Support of Defendants' Motions for Summary Judgment (Dkt. 72-3) ("Ds' Joint Decl."). Under the Agreement, MVSS is obligated to provide materials as described in a specific project description, provide certain "Annotation/Technical Information," and to limit any use of Radient materials for agreed-upon purposes. Agreement at 2. Radient agreed to test Onko-Sure on the MVSS samples, to provide data it generated as a result of the project, to limit its use of MVSS materials to certain purposes, and to return or destroy MVSS's materials at the end of the project. *Id.* at 2-3, Ex. A-1. MVSS, Mayo Clinic, and Mayo's physicians have a right to publish articles reporting on the results of the project. *Id.* at 5. In return for the MVSS materials, technical information, and other services provided, Radient agreed to pay MVSS a fee of $312, 072. *Id.* at 6, Budget Estimate for Collaboration Agreement.[5] Neither MVSS nor Radient were allowed to "use the name of the

---

[3] As Plaintiffs note, in 2010, prior investors filed at least two lawsuits against Radient over the terms of those investments.

[4] At the time, Radient was known by its former name, AMDL, Inc.

[5] This budget sheet is an attachment to the Collaboration Agreement.

other party," "in any news release, publicity, promotion, endorsement or advertising without the prior written consent of the other." Collaboration Agreement at 8. Further aspects of the Agreement shall be discussed below.

### Modification to the Evaluation of Onko-Sure

In October 2010, Radient and MVSS changed their agreement to add new services that MVSS would perform. DF 29; Change Order at 1, Ex. E to Ds' Joint Decl. MVSS agreed to divide out a portion of each sample it would provide to Radient, to test CEA on the divided-out sample, and to send the remaining portion of the specimen to Radient. *Id.* In return, Radient agreed to pay an additional $134.27 per specimen ($132,793.04 for the 989 specimens) along with a Change Order fee of $23,424.84. Change Order at 1.

### Testing and Delayed Payment

MVSS's portion of the testing, the CEA tests on samples, began in late November 2010. DF 38. It was complete by the end of December 2010. DF 39.

In early December 2010, MVSS staff mentioned in an e-mail to Ariura that Radient needed to pay a remaining amount of the fee before MVSS would release the results of its CEA testing. PF 76 (Ex. 14 to Decl. of Philip Kim in Opposition to Defendants' Motions for Summary Judgment). Ariura told MVSS staff that Radient would wire the money on the expected completion date. *Id.* After that date passed, and after two e-mails inquiring about payment, Ariura informed MVSS on January 17, 2011, that Radient was in the final stage of a financing round, expected that round to close soon, and was prepared to wire the money once it received the financing. *Id.* Linda Sanders, a manager for MVSS, e-mailed Ariura, as well as other Radient staff, including MacLellan, and told him she was "quite surprised," that "[y]ou are aware all services need to be paid in advance," and that "Mayo has been extremely patient with Radient in the past (we waited an entire year for payment), and future patience should not be expected." *Id.* Sanders stated that she expected a specific date for payment, and that MVSS had agreed to provide the additional testing because Radient had assured MVSS it understood the need to pay in advance. *Id.* at PK 158.

//

The Press Release

The next day, January 18, 2011, Radient sent out a press release (the "January 18 Press Release") that stated that Radient, "announced today progress on its clinical study with Mayo Clinic ("Mayo") for the validation of the Company's US FDA-cleared Onko-Sure . . ."[6] Based "on recent advancements, RPC [Radient] anticipates it will complete the clinical trial with Mayo in the first quarter of 2011." The Press Release further stated:

> The clinical trial represents the largest study conducted to date for RPC's Onko-Sure . . . . Approximately 1,000 colorectal patient samples with various disease stages are being tested in parallel by RPC and Mayo to directly compare the efficiency of the Onko-Sure test with the [CEA] test.
> [. . .]
> Topline goals of the study include: (1) validation of the overall effectiveness of Onko-Sure for the detection of colorectal cancer as compared with normal and benign controls; (2) assessing the efficiency of Onko-Sure in each independent colorectal cancer stage; (3) assessing the overall efficiency of RPC's Onko-Sure IVD test as compared with that of the CEA test; and (4) comparing the stage-specific efficacy of Onko-Sure versus CEA; especially early cancer stages.
> [. . .]
> "We are proud to have reached this important milestone," commented Douglas MacLellan, Chairman and CEO of Radient Pharmaceuticals. "RPC's executive team has been aggressively cultivating relationships across a broad base of oncology and healthcare practitioners and the consistent feedback we've received in regards to the long-term potential of Onko-Sure test has been overwhelmingly positive. To have internationally recognized leaders in oncology take such great interest in Onko-Sure is a testament to the importance of the test and we look forward to the long-term and positive impact these relationships and results of the Mayo study can potentially have for cancer physicians and their patients, our Company and shareholders.

The January 18 Press Release did not refer to MVSS at any point. Each side's further factual contentions about the press release shall be summarized below.

TheStreet.com Article and Mayo Clinic's Statement

On March 7, 2011, TheStreet.Com, a financial news website, published an article about the Radient press release. Mayo Clinic spokeswoman Kathy Anderson testified that she provided the following statements to media inquiries, including TheStreet:

---

[6] The press release is Exhibit J to Ds' Joint Decl. Though not specified in the press release, the "progress," according to Defendants, was that MVSS had completed its CEA testing "less than three weeks prior." Radient's Reply at 1; DF 39.

- "Mayo is not engaged in clinical studies with Radient and does not have a partnership agreement with Radient"
- "Mayo Clinic does have a collaboration agreement with Radient whereby Mayo Validation Support Services provided bio specimens from our Bio Specimen Bank to Radient for clinical studies."
- "The services Mayo was required to provide to Radient have been fulfilled. Any clinical study results about Onko-Sure would be provided by Radient, not Mayo Clinic."

Kim Decl. in Response to Defendants' Evidentiary Objections (Dkt. 84) ("Kim Evid. Decl.") at Ex. 25.[7] On March 7, 2011, the Mayo Clinic published those statements on its website.[8] The article on TheStreet stated that in "linking Mayo Clinic to Onko-Sure, Radient appears to be exaggerating the research hospital's involvement and interest."

//

//

---

[7] The Court OVERRULES Defendants' objections that TheStreet article, Kim Decl. at Ex. 8, is insufficiently authenticated. The printout has sufficient indicia of authenticity to be admitted. *See Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1091 (N.D. Cal. 2011) (citing *Premier Nutrition, Inc. v. Organic Food Bar, Inc.,* No. SACV 06–0827 AG (RNBx), 2008 WL 1913163, at *6 (C.D.Cal. Mar. 27, 2008)). However, Defendants' objection that Anderson's statements, relayed through TheStreet's report, are inadmissible hearsay is SUSTAINED, as the residual hearsay exception under Federal Rule of Evidence 807 is not met. This is because the report is not more probative "on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," Fed. R. Evid. 807, because testimony from the article's writer is the best available evidence. *Larez v. City of Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991). Thus, to the extent Plaintiffs offer the article for the truth of statements made, the article is inadmissible. This would not seem to have a major effect at the summary judgment stage because Anderson wrote an e-mail to Radient with the same statements as in her quotes in TheStreet's article, Kim Evid. Decl. at Ex. 25, she confirmed that a blog posting on the Mayo Clinic's website is, in relevant part, the same content that she wrote to TheStreet in response to a reporter's inquiries about the Press Release, *id.* at Ex. 24, PK 117-120, and there is no indication of any dispute about the trustworthiness of the Mayo Clinic's statement, *see* MacLellan Depo., 84:12-86:2, *id.* at Ex. 26 (confirming the content of the Mayo statement in the blog post is the same as the Anderson e-mail). Because Anderson is the author of the written denial of a clinical study with Radient, the residual hearsay exception would apply to the blog posting. *Larez*, 946 F.2d 630 at 644. Defendants' objection to introduction of the Mayo Clinic's blog post, Kim. Decl. at Ex. 9, is thus DENIED. TheStreet's article is admissible for the purpose of showing its effect on Radient's stock price, as that is not offering the article's contents for the truth of its assertions.

[8] In the blog post, the relevant content appears in this order: "Mayo Clinic does have a collaboration agreement with Radient whereby Mayo Validation Support Services provided bio specimens from our Bio Specimen bank, to Radient for clinical studies. Mayo is not engaged in clinical studies with Radient and does not have a partnership agreement with Radient. The services Mayo was required to provide to Radient have been fulfilled. Any clinical study results about Onko-Sure would be provided by Radient, not Mayo Clinic." Kim Decl. Ex. 9 at PK 114.

<u>Plaintiffs' Further Facts About Press Release Drafting</u>

MacLellan told Ariura to put together a few paragraphs of what would eventually become the January 18 Press Release. PF 52. An early draft touts the study as Radient's "latest Onko-Sure Trial," describes plans for Radient to merge its Onko-Sure data with CEA data from MVSS, and makes one reference to the Mayo Clinic, noting that two doctors from the clinic would decide how to best communicate any resulting data. Kim Decl. Ex. 20 at PK 296. Staff at Radient circulated drafts by e-mail, and noted "(no mention of Mayo)" in the e-mail subject line. *See, e.g.*, *id.* at PK 295. A later draft, from January 15, 2011, makes no reference at all to Mayo and also refers to the study as the "Onko-Sure Trial." *Id.* at PK 297.

A draft from January 12 did make clear references to Mayo. It had the following relevant text (in bold) after MacLellan's comment (that made it into the January 18 Press Release) about having reached "this important milestone":

**Collaboration with Mayo is critically important to the commercialization strategy and plan for Onko-Sure.** To have internationally recognized leaders in oncology evaluate Onko-Sure is a testament to the importance of our test. **It is also a boost for RPC to be involved and collaborate with such a prestigious cancer center like Mayo.** We look forward to the long-term impact this could have on patient care as well as our business model.

January 12 Draft, Kim Decl. at Ex. 18, at PK 285.

Before the January 18 Press Release went out, both of Radient's scientific employees involved in the study, Drs. Small-Howard and Afsaneh Motamed-Khorasani, raised worries about it. Motamed-Khorasani e-mailed a public relations employee, as well as MacLellan and Ariura, and noted that Radient had still not paid for the study, and that "I think we need to pay Mayo first before we can send out the press release with their name on it." Kim Decl. Ex. 10 at PK 118. Small-Howard, who was copied on the e-mail, replied to all agreeing that "Mayo is not in a favorable mood," and that "We should consider the future implications of a press release at this time," given the earlier e-mail in which MVSS expressed frustration with Radient over nonpayment. *Id.* Despite the fact that the Collaboration Agreement required MVSS or Mayo Clinic's approval before using their names in a press release, PF 65, MacLellan went ahead and told his employees to issue the press release. PF 68.

Defendants' Further Facts About Past Press Releases

Defendants note occasions when past Radient press releases had passages similar to those in the January 18 Release. For example:

- A February 2009 Press Release announced Radient "entered into a collaborative agreement with Mayo Clinic to conduct a clinical study for the validation of" Onko-Sure. DF 47.

- After the Change Order in May 2010, another press release, issued August 31, 2010, stated that Radient "has resumed collaborations with Mayo Collaborative Services, Inc., to conduct a clinical study for the validation" of Onko-Sure, and the release also disclosed that the samples tested "will be tested in parallel by RPC and Mayo Clinic to directly compare the results of the Onko-Sure test with the" CEA test. DF 51; Ds' Joint Decl. Ex. F at RW60.

Competing Facts About the Mayo Clinic's Involvement

Plaintiffs contend that it is not true that Radient and Mayo Clinic were working together on a clinical trial of Onko-Sure. PF 35-36. They contend it is false to say Radient has a clinical study "with Mayo Clinic" for "the validation of the Company's US FDA cleared Onko-Sure," and that it is misleading to refer to the study as the "Mayo study." PF 36.

Plaintiffs contend that neither Mayo Clinic nor MVSS conducted any testing, analysis, or review of Onko-Sure. PF 38-42.

**Plaintiffs marshal these further facts:**

- Radient's Dr. Andrea Small-Howard, one of its two scientists involved in the collaboration with MVSS testified that:

   o She did not know if Mayo Clinic in any way tried to validate Onko-Sure, PF 38;

   o Mayo never assessed the efficiency of Onko-Sure, PF 40;

   o Mayo never compared the efficacy of Onko-Sure versus CEA for specific stages of cancer, PF 41;

   o Mayo never did any statistical analysis related to Onko-Sure, PF 42;

- o   Mayo never provided any feedback about the long-term potential of Onko-Sure, PF 44;[9]

- Laura Hanson, an MVSS project coordinator, testified that the Mayo Clinic's response to the Press Release was an accurate summary of the relationship between Mayo and Radient and, like Small-Howard, agreed that:

  - o   Mayo and MVSS never did any testing or data analysis with respect to Onko-Sure, including never comparing Onko-Sure and CEA, PF 40-42;

  - o   And that MVSS was not asked to provide feedback about the long-term potential of Onko-Sure, PF 44.

**Defendants marshal these further facts:**

- Dr. Motamed-Khorasani, Radient's Director of Oncology, testified that Radient was engaged in a study with Mayo, DF 9;

- The Project Description called the project "Evaluation of [Onko-Sure] in Colon Cancer," DF 21;

- Mayo Clinic physicians provided scientific oversight, were designated as the Mayo Clinic's co-Principal Investigators, and were involved in drafting a written protocol for the collaboration, DF 13-14, 30-31;

- Mayo Clinic's Institutional Review Board, which reviews clinical studies to make sure they meet any federal regulations and Mayo Clinic standards for research, reviewed and approved the protocol for the Collaborative Agreement, DF 34-35;

- Mayo had an option to license under the Collaborative Agreement to license Onko-Sure for use at Mayo, DF 26;

- MVSS personnel spent 836 hours on the work required by the Collaborative Agreement, and also ran the CEA tests on 989 divided-out samples;

---

[9] As noted above, the January 18 Press Release identified "Topline goals" to include "(1) validation of the overall effectiveness of Onko-Sure for the detection of colorectal cancer as compared with normal and benign controls," "(2) assessing the efficiency of Onko-Sure" in each colorectal cancer stage, "(3) assessing the overall efficiency" of Onko-Sure compared with CEA, and "(4) comparing the stage-specific efficacy of Onko-Sure versus CEA."

- Radient Dr. Motamed-Khorasani, testified that the study with Mayo did do all of the tasks mentioned in the Topline goals of the January 18 Press Release, RF 61-64;

- Dr. Robert W. Beart, a former doctor at Mayo Clinic from 1976 to 1992, and past chairman of its Department of Colorectal Surgery, concurred that the study between Mayo and Radient did do all of the tasks in the Topline goals of the January 18 Press Release, *id.*; [10]

- MacLellan testified that their was a clinical study between Mayo and Radient, RF 9, and concurred with the opinions of Drs. Beart and Motamed-Khorasani, RF 61-64.

## III.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). When a court finds part of a contract to be ambiguous, it ordinarily should be "hesitant to grant summary judgment 'because differing views of the intent of parties will raise genuine issues of material fact.'" *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) (quoting *Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir.1993). With a contract ambiguity, the court should determine whether the ambiguity could be resolved consistent with the non-moving party's contention. *Id.* If so, summary judgment should be denied. *Id.* In such an analysis the court must, of course, construe evidence in the non-moving party's favor, and draw all reasonable inferences in that same manner. *Id.*

---

[10] Counsel for MacClellan & Ariura clarified at oral argument that Dr. Beart's connection to this case is that he is a member of Radient's board of directors.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## IV.   Discussion

Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.  The elements of a § 10(b) private action are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157 (2008).  Defendants make a passing claim that Plaintiffs "cannot present evidence to support any one of these elements,"[11] but the only

---

[11] Memorandum of Points and Authorities Supporting Defendants Douglas C. MacLellan and Akio Ariura's Motion for Summary Judgment (Dt. 73-1) ("MacLellan and Ariura MPA" or "Ds' MPA") at

argument they make is that Plaintiffs' lack evidence of material misrepresentation, scienter, and loss causation. Ds' MPA at 12.

### a. Plaintiffs have Shown a Genuine Issues of Material Fact as to Material Misrepresentations in the January 18 Press Release

The Court notes at the outset that Defendants argue that a material misrepresentation or falsehood must be judged "in light of all the information then available to the market." Ds' MPA at 13 (citing *In re Convergent Tech. Sec. Litig.,* 948 F.2d 507, 512 (9th Cir. 1991). Plaintiffs are correct that this is not part of an element of securities fraud. The Court in *Convergent* was making a particular point that a statement, even if literally true, could be misleading. In that circumstance, other information available could shed light on whether a statement was misleading. *See id.*[12] Investors "are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) (citing *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1114 (9th Cir.1989)). If there is an issue of material fact about whether statements on their own were misleading, then an argument that they were not misleading in light of other statements Defendants made is an attempt to argue the affirmative defense of truth-on-the-market. *See Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).

//

---

12; Memorandum of Points and Authorities Supporting Radient Pharmaceutical Corporation's Motion for Summary Judgment (Dkt. 72-1) ("Radient MPA") at 12-13. Defendants submitted the substantially the same memoranda, with the exception that the MacLellan and Ariura MPA has additional argument about the Section 20(a) claims. Thus, the Court will cite to the MacLellan and Ariura MPA as "Ds' MPA."

[12] "Of course, as the plaintiffs note, an issuer's public statements cannot be analyzed in complete isolation. 'Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.' [citation omitted]

Thus, to prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.*

### i. The Core Evidence from which a Jury could find Misleading or False Statements

The January 18 Press Release begins with an announcement of progress on Radient's "clinical study with Mayo Clinic ("Mayo") for the validation of" Onko-Sure. Plaintiffs contend that this is misleading both because it claims Radient had a clinical study with Mayo, and because it claims the study with Mayo is for the purpose of validating Onko-Sure. Evidence that could be seen in Plaintiffs' favor begins with the fact that the Collaborative Agreement was not made with Mayo—it was an agreement between MVSS and Radient. That Agreement set out major obligations that focused on MVSS providing blood samples to Radient, and Radient paying for those samples. The Change Order to add a CEA test could reasonably be seen as falling well short of creating a clinical study with the Mayo Clinic—again, the agreement was with MVSS, and the chief purpose could reasonably be seen as an exchange by which Radient paid MVSS and MVSS tested and provided results.

Radient's own scientist, Dr. Andrea Small-Howard, testified that Mayo never did any statistical analysis about Onko-Sure, that she did not know if Mayo in any way tried to validate Onko-Sure, and that Mayo never examined the efficiency or efficacy of Onko-Sure. Laura Hanson, the MVSS project coordinator, testified that the Mayo Clinic's response to the January 18 Press Release was an accurate summary of the relationship between Mayo and Radient. That response denied that Mayo was involved in clinical studies with Radient, and stated that there was the Collaborative Agreement by which MVSS provided bio specimens to Radient. Hanson testified that neither Mayo nor MVSS ever did any testing or data analysis with respect to Onko-Sure.

Defendants' counterarguments fall well short of showing that there is no issue of material fact. Even if MVSS's obligations went beyond the mere sale of blood and tissue samples, a jury could find that this was not a clinical study entered into with Mayo Clinic. It is true, as Defendants contend, that doctors and employees from Mayo worked on the Collaborative Agreement, Hanson Depo. at 60:11-61:12, Ds' Joint Decl. Ex K, including by feeding blood samples into a machine that then automatically generated the result of

the CEA test, PF 18. And it is true that MVSS had to draft a protocol for preparing blood samples and setting limits on Radient's use of those samples, and that that MVSS had to obtain approval from Mayo's Institutional Review Board. DF 34-35. While Defendants could argue that this supports calling the collaboration between MVSS and Radient a "clinical study with Mayo Clinic," other reasonable inferences are certainly possible.[13]

For example, Plaintiffs note that a protocol and Institutional Review Board approval is a necessary task because of the sale of blood samples: medical ethics and federal law require a protocol and a review board approval. 45 C.F.R. § 46.101(a), 46.109, 46.117; PF 49. The 836 hours (apart from CEA testing) MVSS or Mayo employees spent on the tasks in the Collaborative Agreement, could be credited by a jury as supporting Defendants' contentions. But it could also be fairly countered by inferences a jury could draw from budget numbers in the Collaborative Agreement: in the initial Collaboration Agreement, of the $312,072 fee that Radient was to pay MVSS, $283, 802 for work in collecting, labeling, and producing blood samples. PF 13. Work developing and getting a protocol approved by the Institutional Review Board accounted for $15,307, or about five percent of the total fee. PF 11. "Management" made up $10,000 of the fee, less than three percent of the total. PF 12. The CEA test, a routine test for MVSS to do by putting samples into a machine, PF 23, was paid per test in the Change Order. Thus, the protocol and the budget numbers, drawing inferences in Plaintiffs' favor, could reasonably be seen as evidence of a relationship that is primarily about selling samples to

---

[13] In their Replies, Defendants argue that the difference between MVSS and the Mayo Clinic is distinction without difference—"like arguing that it is misleading to say that one drives a General Motors car and not a Chevrolet." Ds' Reply at 7. (Radient and Defendants MacLellan and Ariura submitted substantially the same Reply, and thus references will be to the MacLellan and Ariura Reply because it addresses Section 20(a) issues as well.) A jury might reasonably see a meaningful difference, perhaps akin to the difference, say, between (1) claiming that one is collaborating with Cadillac on a study of one's engine diagnostic kit, and (2) claiming that one has the same study with a parts and testing company that is a service line of a subsidiary owned by Cadillac. The fact that previous Press Releases stated that the collaboration was with MVSS, not Mayo, Ds' Joint Decl. Ex. F at RW60, does not lay this issue to rest. To the extent Defendants' argue that that disclosure negates any potential to mislead, this is a truth-on-the-market affirmative defense, and not grounds for holding that Plaintiffs failed to show a material dispute.

a purchaser, with the vendor taking care of necessary tasks that were incidental to the selling of samples.[14]

To further show that there are genuine issues of material dispute, one might consider two other passages in the January 18 Press Release that a juror could reasonably find to have furthered the material misrepresentation of a clinic study "with Mayo Clinic."

First, consider the four "Topline goals" of the study. All are about Onko-Sure—validating its effectiveness, assessing its efficiency in different cancer stages, and assessing it against the CEA. Radient's two scientists involved in the study, Drs. Small-Howard and Motamed-Khorasani, testified in varying ways about Mayo's involvement on those goals. Small-Howard testified that Mayo did no statistical analysis of Onko-Sure, never assess it against CEA, and that she did not know if Mayo in any way tried to validate Onko-Sure. PF 38-42. Such testimony undermines the idea of a clinical study with Mayo Clinic because it supports the idea that Mayo had little involvement with any of the four purported goals of the study. Motamed-Khorasani testified that *the study with Mayo* did do all of those tasks. Reply DF 61-64. Motamed-Khorasani was answering what the study did, rather than what MVSS or Mayo did separate from any of Radient's work. But even if one drew the inference in Defendents' favor (which one cannot do at summary judgment), Motamed-Khorasani is contradicting his fellow Radient scientist. At best (for Defendants), that leaves a material dispute as to how involved Mayo even was in the Topline goals.

---

[14] The fact that the Collaborative Agreement required Radient to provide study results to MVSS, and then gave MVSS and Mayo a right of first refusal for publication does not change the fact that there are genuine disputes as to whether a characterization of a clinical study "with Mayo Clinic" is accurate. There is evidence from MVSS's Laura Hanson that such a provision is part of every MVSS contract. PF 31, 33. Whether this would reasonably lead a company like Radient to believe it was in a clinical study with Mayo Clinic would remain a jury question, given that this provision was boilerplate language for MVSS. *See, e.g.*, *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994) (noting that boilerplate language may be "barely a prima facie indication that the right secured is 'important' to the benefited party").

Second, consider this passage in the January 18 Press Release (emphasis added in bold):

> "We are proud to have reached this important milestone," commented Douglas MacLellan, Chairman and CEO of Radient Pharmaceuticals. "RPC's executive team has been aggressively cultivating relationships across a broad base of oncology and healthcare practitioners and the consistent feedback we've received in regards to the long-term potential of Onko-Sure test has been overwhelmingly positive. **To have internationally recognized leaders in oncology take such great interest in Onko-Sure is a testament to the importance of the test** and we look forward to the long-term and positive impact these relationships and results of the Mayo study can potentially have for cancer physicians and their patients, our Company and shareholders.

There is only one internationally recognized leader in oncology mentioned by name in the January 18 Press Release—Mayo Clinic. But the passage in bold is not a reference to Mayo, according to Radient. *See* DF 66. It instead refers to other, unnamed, internationally recognized leaders in oncology.[15] Nor was Radient referring to Mayo as an oncology practitioner giving "consistent feedback" that was "overwhelmingly positive" about Onko-Sure's "long-term potential." Reply PF 44.

Thus, for the reasons above, the Court DENIES Defendants' Motion for Summary Judgment with respect to whether a reasonable jury could find material misrepresentations in the January 18 Press Release.

### b.  Defendants are not Entitled to Summary Judgment on Scienter

Scienter means a mental state "embracing intent to deceive, manipulate, or defraud," or at a minimum, deliberate or conscious recklessness. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 979 (9th Cir.1999).  [R]eckless conduct may be defined as ... an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir. 1990). A corporation's

---

[15] Plaintiffs do not dispute that there were other internationally recognized leaders in oncology who were interested in Onko-Sure. Plaintiffs' Reponse to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law (Dkt. 77) 66. The point here is that this statement can be literally true, yet support a reasonable juror's view that Radient was misrepresenting the extent of Mayo Clinic's interest and collaboration.

1  scienter is shown by showing scienter for its officers or directors. *Brown v. China Integrated*
2  *Energy, Inc*., 875 F. Supp. 2d 1096, 1120 (C.D. Cal. 2012).

3       "Summary judgment is generally inappropriate when mental state is an issue, unless no
4  reasonable inference supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson &*
5  *Curtis, Inc*.., 739 F.2d 1434, 1436 (9th Cir.1984); *see also In re Software Toolworks Inc.,* 50
6  F.3d 615, 626 (9th Cir.1994) (citations omitted) ("Summary judgment on the scienter issue is
7  appropriate only if 'there is no rational basis in the record for concluding that any of the
8  challenged statements were made with the requisite scienter.").

9       Defendants argue that is no evidence to support scienter, and that several pieces of
10  evidence negate any inference that Defendant MacLellan acted with scienter.[16] For example,
11  Defendants claim that during the Class Period MacLellan never sold any of the Radient shares
12  he held. Ds' MPA at 17. But the contention that this negates an inference of scienter reads the
13  underlying cases too broadly. In *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 11117 (9th
14  Cir. 1989), the plaintiff tried to prove scienter solely by raising evidence about defendants
15  selling their stock in Apple. There were no suspicious sales, the court held, which negated the
16  inference that plaintiff tried to show through sales alone. *Id.* at 1118.[17]

17       Defendants contend that because MacLellan disclosed the details of the Collaborative
18  Agreement to investors, and put out press released about the arrangement with MVSS, that too
19  negates any inference that he sought to deceive investors. Ds' MPA at 18. As a related
20  argument, Defendants contend that because Mayo approved of statements with similar language
21  to the January 18 Press Release, this negates any scienter. The problem with this argument is
22  that in prior press releases, MacLellan had Mayo's permission and cleared the information as
23  required by the Collaborative Agreement. For the January 18 Press Release, he broke from that
24  pattern. Importantly, the prior releases also varied from the January 18 Press Release in how

26  [16] Because MacLellan is the only officer of Radient facing a 10b-5 claim, any liability of Radient turns
27  on his scienter.
    [17] Plaintiffs correctly note that Defendants' other cases provide no more support than *In re Apple*. In *In*
28  *re Silicon Graphics, Inc*., 183 F.3d at 970, 987-88 (9th Cir. 1999), the issue was similarly an analysis of
    suspiciousness of stock sales.

they characterized work with MVSS. For example, a February 17, 2009, Press Release does indeed announce a an agreement "with Mayo Clinic to conduct a clinical study." But the press release discloses in an "About Mayo Clinic" section that the actual entity involved is MVSS, and that the contribution to the study is one of "well-annotated biospecimens and clinical follow-up data." Ds' Joint Decl. Ex. R at RW330. An August 31, 2010, press release is even clearer on the distinctions between Radient and MVSS and Mayo: it announces "resumed collaborations" with MVSS's immediate parent company, "Mayo Collaborative Services," states that Radient expects to validate the effectiveness of Onko-Sure, and defines MVSS and its contribution in the description of the parties mentioned in the press release, as was the case for the February 17, 2009, Press Release.[18] *Id.* Ex. F at RW 60-61. Mayo public relations staff told Radient in an e-mail describing the August 31, 2010, Press Release that "Mayo Clinic can not [sic] be used in the opening sentence," that Mayo Collaborative Services should be the first reference because that is the party to the contract. *Id.* Ex. G at RW63. Mayo also added a paragraph on MVSS, the service line of Mayo Collaborative. *Id.*

Here, Plaintiffs have already made a sufficiently strong showing to survive summary judgment on misleading statements. Further, it is undisputed that:

- MacLellan had ultimate authority over the release of the January 18, 2011, Press Release, Reply PF 56;

- MacLellan knew Mayo was not testing Onko-Sure on samples that MVSS provided, Reply PF 58;

- MacLellan knew Mayo was not working on the Topline goals with respect to any work on Onko-Sure, *see* Reply PF 60;

---

[18] To the extent that Defendants' discussion of prior statements and press releases is a truth-on-the-market affirmative defense, that defense fails at the summary judgment stage because such an "intensely factual" defense requires a showing that any corrective statements were made with the intensity and credibility as any false statements. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992); *Provenz v. Miller,* 102 F.3d 1478, 1492–93 (9th Cir.1996). Defendants bear a "heavy burden" of proof. *Provenz*, 102 F.3d at 1493.

- MacLellan knew the protocol in the MVSS agreements did not identify the Topline Goals of the study as mentioned in the Press Release, and he knew investors did not have access to the protocol, Reply PF 60-61;

- MacLellan knew Mayo Clinic had not provided feedback to Radient about the long-term potential of Onko-Sure, nor was it one of the "internally recognized leaders in oncology" that took great interest in Onko-Sur, Reply PF 63-64;

- MacLellan knew he needed written consent of Mayo or MVSS to use their names in a press release, did not obtain that consent, Reply PF 65-67;

- MacLellan was aware of earlier drafts of the January 18, 2011 Press Release, drafts that had no mention of Mayo Clinic, Reply PF 68-69;

- MacLellan was aware that his two scientists working with MVSS expressed concerns about releasing a press release with Mayo's name on it, *see* Reply PF 71.

In a prior Order on a Motion to Dismiss, this Court found *Howard v. Everex Systems, Inc.*, a case at the summary judgment stage, instructive on the issue of scienter. *Nguyen v. Radient Pharmaceuticals Corp.*, SA CV 11-0406 DOC, 2011 WL 5041959 at *8 (C.D. Cal. Oct. 20, 2011). This Court cited *Howard* as an example where courts "have held that a demonstration of a desire to raise company financing, combined with the 'red flags' of a company's financial condition, are sufficient to plead scienter." *Id.* Here, there is a triable issue about false or misleading representations, MacLellan had information available about the MVSS-Radient relationship that would correct those alleged misleading representations, Radient had been hemorrhaging money prior to the Class Period, and Radient needed its current financing round to succeed to even be able to pay for the MVSS services it was touting in the press release. On that evidence, there is a triable issue as to scienter, and Defendants' Motion must be DENIED.

### c.  Because there is a Genuine Dispute of Material Fact as to Misrepresentations, Defendants' Loss Causation Argument Loses

Loss causation is a causal connection between a defendant's material misrepresentation and a plaintiff's loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (citing *Dura Phamaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). This

element is met by showing a corrective disclosure revealed a false statement and was then followed by a stock price decline. *In re Daou Systems., Inc.*, 411 F.3d 1006, 1026 9th Cir. 2005). As the summary judgment stage, a defendant would need to show that depreciation of a stock was the result of factors other than alleged false and misleading statements to prevail. *See Provenz*, 102 F.3d at 1492.

TheStreet's article matches the central contentions by Plaintiffs as to misrepresentations: that Radient exaggerated Mayo's involvement, and that it could not accurately be claimed that there was a clinical study with the Mayo Clinic. After the article was published, Radient's stock dropped 26 percent, and Plaintiffs have introduced expert evidence testifying in support of Plaintiffs' loss causation theory. PF 86-87; Kim Decl. Ex. 15 at ¶¶ 70-76.[19] Because there are triable issues as to whether the January 18 Press Release contains misrepresentations, and those alleged misrepresentations match the gist of TheStreet's article, Defendants' argument that there was no truth in the article necessarily fails.

Thus, the Court DENIES Defendants' Motion for Summary Judgment as to their loss causation argument.

### d. Defendants' Argument on Section 20(a) Claims Fails Against MacLellan Because he Clearly Exercises Actual Power Over Radient, and the Court Reserves Decision on that Claim as to Ariura

---

[19] On April 26, Defendants filed an Ex Parte (Dkt. 85) seeking to continue the hearing on their Motions because they had not had a chance to depose Plaintiffs' experts and file a *Daubert* motion. FRCP 26(a)(2)(D) states that a party must make expert disclosures at the times and in the sequence that the court orders. Absent a stipulation or court order, the default rule is that the disclosures must be made at least ninety days before the date set for trial. It is not clear from Defendants' ex parte what disclosure agreement they accuse Plaintiffs of violating. A Stipulation (Dkt. 70) entered into on February 12, 2013, set the date for serving expert reports as March 29, 2013, the day that Plaintiffs served their reports. Trial is scheduled for November 12, 2013, so the expert reports were served well before ninety days before trial. Defendants also failed to present a good reason for filing the ex parte on the Friday before a Monday hearing, when they had known about the expert report disclosures for nearly a month. For those reasons, the Court denied the Ex Parte. Because (1) Defendants attacked Plaintiffs' experts only in conclusory terms, (2) it does not appear Plaintiffs fell short of any disclosure obligation, and (3) the experts have not had any bearing on the outcome of this Order, the Court did not grant more time for depositions and *Daubert* motions at the summary judgment stage.

Plaintiffs' Section 20(a) claims against Ariura and MacLellan require (1) an underlying violation of securities laws, and (2) that the individual defendants exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because there are triable issues as to Section 10(b) and Rule 10b-5 violations, Defendants' arguments as to the liability of MacLellan necessarily fail. This is because Defendants argue there was no primary violation, and that MacLellan relied in good faith on Mayo Clinic's Public Affairs Department. But he skipped over that public affairs department in issuing the January 18 Press Release, and Defendants provide no source to support the idea that MacLellan could rely on past approvals where the January 18 Press Release differed from those past press releases. *See* Section III.b, *supra*.

As to Defendant Ariura, the Court GRANTS his Motion for Summary Judgment, as there is insufficient evidence that he had direct involvement with the alleged false statements based on the record at summary judgment. For example, although MacLellan told Ariura to prepare a few paragraphs that eventually led to the January 18 Press Release, there is no indication Ariura did write those paragraphs, or did anything beyond grammatical and minor edits as part of a team of Radient employees. Reply PF 53-54. Plaintiffs devote only one paragraph in rebuttal as to Ariura, and their case cited in support would require finding his direct involvement with alleged false statements. *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441-42 (9th Cir. 1987). Plaintiffs raised an argument at oral argument that Ariura had actual power or control based on his obligations under the Sarbanes-Oxley Act, but such an argument was never made earlier. Plaintiffs cited no case law to support a per se rule that Sarbanes-Oxley obligations would raise a triable issue as to Ariura here.

//

//

//

//

//

//

**IV.     Disposition**

For the foregoing reasons, the Court DENIES Defendants' Motions for Summary Judgment in all respects except one: It GRANTS Defendant Ariura's Motion for summary judgment as to the Section 20(a) claim against him.


DATED:      May 17, 2013

*David O. Carter*
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE