Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq. (pro hac vice)
Jonathan Horne, Esq. (pro hac vice)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| VINH NGUYEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> v. <br><br> RADIENT PHARMACEUTICALS CORPORATION AND DOUGLAS C. MACLELLAN, <br><br> Defendants. | CASE No.:CV-11-0406-DOC (MLGx) <br><br> CLASS ACTION <br><br> **PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4)** <br><br> Final Pre-Trial Conference: November 4, 2013 <br> Time: 8:30 a.m. <br> Courtroom: 9D <br><br> Trial Date: November 12, 2013. <br><br> Hon. David O. Carter |

# **TABLE OF CONTENTS**

**Page Nos.**

TABLE OF AUTHORITIES.................................................................................iii

I.    PRELIMINARY STATEMENT ...........................................................1

II.   SUMMARY STATEMENT OF CLAIMS PLAINTIFFS HAVE
      PLEADED AND PLAN TO PURSUE ..................................................1

A.    Claim One- Section 10(b) and Rule 10b-5 ................................1

      1.    Summary Statement of Claim One ...................................1

      2.    Elements Required to Establish Claim One ....................4

B.    Claim Two (Section 20(a) - Control Person)............................4

      1.    Summary Statement of Claim Two .................................5

      2.    Elements Required to Establish Claim Two....................5

III.  KEY SUPPORTING EVIDENCE ........................................................5

A.    Violation of Exchange Act § 10(b) and SEC Rule 10b-5...........5

      1.    Defendants Made Untrue Statements of Material Fact or
            Omissions ........................................................................5

      2.    Defendants Acted with Scienter .....................................10

      3.    Plaintiffs Satisfy the "In connection with" Requirement13

      4.    Plaintiffs Can Satisfy the Reliance Element..................13

      5.    Plaintiffs Will Prove Loss Causation ............................14

      6.    Plaintiffs Can Show Economic Loss ..............................15

B.    Violation of Exchange Act § 20(a) ..........................................15

      1.    MacLellan is Liable as a Control Person........................16

IV.   RESPONSE TO AFFIRMATIVE DEFENSES .................................16

i

V.     ANTICIPATED EVIDENTIARY ISSUES ........................................18

VI.    BIFURCATION OF ISSUES...............................................................18

VII.   JURY TRIAL ...................................................................................18

VIII.  ATTORNEY'S FEES.........................................................................18

IX.    ABANDONMENT OF ISSUES ........................................................19

IX. ABANDONMENT OF ISSUES............................................................ 19

1

## TABLE OF AUTHORITIES

2

3

**Cases**                                                    **Page number**

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
   189 F.3d 1017 (9th Cir. 1999)...................................................................... 15

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ......................................................................... 5, 6, 14

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999)...................................................................... 14

*Brown v. China Integrated Energy, Inc.*,
   875 F.Supp.2d 1096 (C.D. Cal. 2012)......................................................... 11

*Broudo v. Dura Pharmaceuticals, Inc.*,
   544 U.S. 336 (2005) .................................................................................. 5, 15

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990)...................................................................... 10

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000)................................................................... 5, 16

*Huberman v. Tag-It Pac., Inc.*,
   314 Fed. App'x 59 (9th Cir. 2009)............................................................... 16

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994)........................................................................ 16

*Nelson v. Serwold*,
   576 F.2d 1332 (9th Cir. 1978)...................................................................... 10

*Provenz v. Miller*,
   102 F.3d 1478  (9th Cir. 1996)................................................................. 6, 18

*Wool v. Tandem Computers,Inc.*,
   818 F.2d 1433 (9th Cir. 1987)...................................................................... 16

**Statutes**

The Exchange Act of 1934 Section 10(b) ....................................................... 1,5

iii

15 U.S.C. § 78u-4(f) ........................................................................ 18

U.S. Const. Amend. VII........................................................................ 21

**Rules**

Fed. R. Civ. P. 23(b)(3) ........................................................................ 1

**Other Authorities**

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.1 (2007)........................................................ 4, 6

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.2 (2007)........................................................ 6

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.3 (2007)........................................................ 10

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.6 (2007)........................................................ 15

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.5 (2007)........................................................ 4, 14

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.7 (2007)........................................................ 16

Ninth Circuit Manual of Model Jury Instructions,
    Civil Instruction 18.8 (2007)........................................................ 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiffs and the class submit their Memorandum of Contentions of Fact and Law pursuant to L.R. 16-4.

## I.   PRELIMINARY STATEMENT

On November 26, 2012 the Court certified this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3). Dkt. # 65.  The class consists of all persons and entities that acquired common stock of Radient Pharmaceuticals Corporation ("Radient" or the "Company"), excluding the defendants, along with the present and former officers and directors of Radient and any of its subsidiaries, members of their families, their legal representatives, heirs, successors or assigns and any entity in which a defendant has a controlling interest, from January 18, 2011 through March 4, 2011 (the "Class Period").

Notice to the class was made by first-class mail and publication in accordance with the order approving notice and summary notice of pendency of class action. Dkt. # 101. Proof of publication of the notice was filed on August 21, 2013.  Dkt. # 103.

## II.   SUMMARY STATEMENT OF CLAIMS PLAINTIFFS HAVE PLEADED AND PLAN TO PURSUE

### A.   Claim One- Section 10(b) and Rule 10b-5

That defendants Radient and Douglas C. MacLellan ("McLellan") violated Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC").

#### 1.   Summary Statement of Claim One

Radient designed and conducted a study to compare its Onko-Sure test against a well-established, routinely administered test called Carcinoembryonic Antigen ("CEA") (the "Onko-Sure Study") that serves as the "standard of care" for detecting colorectal cancer.  To that end, Radient entered into agreement with Mayo Validation Support Services, Inc. ("MVSS"). Radient's agreement with

1

MVSS required MVSS to provide blood specimens and patient information about the specimens.  The agreement was expanded to include the results of testing the specimens on the CEA test, for use in the Onko-Sure Study. In return for providing the specimens and testing them on the CEA test in its lab, Radient paid MVSS nearly half a million dollars.

Radient's business relationship with MVSS is the relationship between a vendor and a client. The vendor provides goods or services, and the client pays the vendor. It is misleading for the client to suggest that the vendor  has a vested interest in the successful outcome of Onko-Sure Study or that Mayo Clinic endorses or sees any value in Onko-Sure, as Radient did ("progress on [Radient's] clinical study with the Mayo Clinic").  It is misleading for the client to suggest that the Mayo Clinic's role and responsibilities in the study are as important as Radient's, as Radient's CEO, MacLellan did (referring to the Onko-Sure study as the "Mayo Study").   It is misleading for Radient to refer to the wrong entity -- to refer not to MVSS, which provides services to *industry*, but the Mayo Clinic, which provides services to *patients*. And it is misleading for the Radient to omit that it is paying for the vendor's services, which is not providing them because it is excited about the client's product, but strictly for profit.  Finally, it was misleading for Radient to state it was the "Mayo [Clinic] study" and then enumerate "Topline Goals," of the study, when neither Mayo Clinic nor MVSS conducted any testing, analysis or review with respect to the Topline Goals.

According to its second-highest ranked scientist, Dr. Afsaneh Motamed ("Dr. Motamed"), Radient viewed the Onko-Sure Study as a "marketing tool". MVSS was, according Dr. Motamed, a high-priced, low-quality provider. The services Radient sought to have MVSS perform were "routine". It makes no

sense for a cash-starved small company like Radient seeking routine products and services to employ a high-priced, low-quality provider -- except if Radient's motive is to misleadingly boost its image by misusing the Mayo Clinic name.

By early 2011, Radient had reached desperate straits. It could not afford to pay MVSS, and its stock price was falling, hurting its ability to raise capital to pay MVSS and other vendors.  By December 2011, MVSS had completed all of its obligations under it supplier agreement with Radient.  However, Radient could not complete the Onko-Sure Study because MVSS would not provide Radient with certain of the supplies (i.e. blood specimens and CEA test information) until Radient paid amounts it owed MVSS.  Radient told MVSS that it would only be able to pay MVSS if and when an upcoming financing was completed.

On January 18, 2011, without obtaining MVSS or Mayo Clinic's approval and against the recommendations of Dr. Motamed and Dr. Andrea Small-Howard ("Dr. Small-Howard"), the Radient Principal Investigator of the Onko-Sure Study, MacLellan ordered Radient to issue a press release implying that Mayo Clinic was its partner and had endorsed Onko-Sure and that it had a vested interest in the success of Onko-Sure. (the "Press Release").  On January 30, 2011, Radient closed a financing, with net proceeds to Radient for $6.7 million, and used those proceeds to pay the amounts it owed to MVSS.

On March 7, 2011, the true facts underlying the business relationship between Radient and Mayo Clinic and MVSS were disclosed in an article issued by TheStreet.com.  These adverse facts caused the price of Radient's stock to fall in a statistically significant amount, damaging Plaintiffs and the class.

### 2.   Elements Required to Establish Claim One[1]

a.   Whether defendants made an untrue statement of material fact or omitted to state a material fact necessary under the circumstances to keep the statements that they did make from being misleading in connection with plaintiffs' purchase of securities;

b.   Whether defendants acted knowingly (with scienter);

c.   Whether defendants used or caused the use of an instrumentality of interstate commerce in connection with the purchase or sale of securities, regardless of whether the instrumentality itself was used to make an untrue statement or a material omission;

d.   Whether plaintiffs are entitled to a presumption of reliance on defendant's statements afforded by the "fraud on market"[2] doctrine by proving by a preponderance of evidence that:

(1)   an efficient market for the securities existed; and

(2)   investors reasonably relied on that market as an accurate reflection of the current market value of the securities;

(3)   and whether Defendants have sufficiently rebutted the presumptions of reliance afforded by the "fraud on the market" doctrine.

e.   Whether the plaintiffs suffered damages as a result of defendants' misrepresentations or omissions, and if so, in what amount.

### B.   Claim Two (Section 20(a) - Control Person)

---

[1] *See* Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.1, 18.5 (2007);

[2] In its order granting class certification, this Court found Plaintiffs have met the required showing of an efficient market for Radient stock during the Class Period to invoke the fraud on the market presumption of reliance.  Dkt. # 65.

4

That defendant MacLellan is liable as a controlling person of Radient for Radient's violation under Claim One.

### 1.     Summary Statement of Claim Two

Defendant MacLellan was a controlling person of Radient, which is primarily liable under Section 10(b) of the Exchange Act for misrepresentations and omissions of material fact in the Press Release, as described in Claim One.

### 2.     Elements Required to Establish Claim Two[3]

a.   A primary violation of the federal securities laws; and

b.   Whether defendants exercised actual power or control over the primary violator.

## III.   KEY SUPPORTING EVIDENCE

### A.     Violation of Exchange Act § 10(b) and SEC Rule 10b-5

#### 1.     Defendants Made Untrue Statements of Material Fact or Omissions

To prove an actionable misrepresentation or omission, plaintiffs must prove that defendants employed a device, scheme or artifice to defraud, made an untrue statement of a material fact, omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading or engaged in an act, practice or course of business that operated as a fraud or deceit in connection with the purchase or sale of securities. Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.1 (2007); *Broudo v. Dura Pharmaceuticals, Inc.*, 544 U.S. 336, 341 (2005) (section 10(b)'s basic elements include a "misrepresentation (or omission)").

A factual representation concerning a security is material if there is a substantial likelihood a reasonable investor would consider the fact important in

---

[3] *See* Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.8 (2007) ; *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

deciding whether or not to buy or sell that security.  An omission concerning a security is material if a reasonable investor would have regarded what was not disclosed as having significantly altered the total mix of information taken into account in deciding whether to buy or sell the security.  Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.2 (2007); *see Basic Inc. v. Levinson*, 485 U.S. 224, 231-32  (1988) (materiality turns on whether there is '"a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available'"); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Materiality is established by 'showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information.'"). Under the Ninth Circuit Model Jury Instruction, plaintiffs must prove by a preponderance of the evidence that the misrepresentation or omission of defendants was material.

The following key evidence shows that defendants misstated the material facts concerning the Mayo Clinic and MVSS's involvement in the misleadingly described "Mayo study" in the Press Release:

- Contrary to the four enumerated "Topline Goals"[4] of the "Mayo Study," Dr. Small-Howard, Radient's top scientist testified in relevant part:

---

[4] "Topline goals of the study include: (1) validation of the overall effectiveness of Onko-Sure(R) for the detection of colorectal cancer as compared with normal and benign controls (2) assessing the efficiency of Onko-Sure(R) in each independent colorectal cancer stage; (3) assessing the overall  efficiency of RPC's Onko-Sure(R) IVD test as compared with that of the CEA test; and (4) comparing the stage-specific efficacy of Onko- Sure(R) versus CEA; especially early cancer stages."

6

- o   Mayo Clinic never did any statistical analysis concerning Onko-Sure.

- o   Mayo Clinic did not compare the accuracy or effectiveness of Onko-Sure against the CEA test.

- o   She was unaware whether Mayo Clinic validated Onko-Sure in any way.

- o   Mayo Clinic never examined the efficiency or efficacy of Onko-Sure.

- o   MVSS and Mayo Clinic did not provide feedback or evaluate in any way the long-term potential of Onko-Sure.

- • Laura Hanson, the MVSS project coordinator, testified in relevant part:

    - o   Mayo Clinic was never asked to do a "systematic investigation of Onko-Sure."

    - o   MVSS did not did not provide any testing or analysis of Onko-Sure.

    - o   MVSS was never asked to provide conclusions or opinions about Onko-Sure.

    - o   MVSS was never asked to provide any opinions on whether Onko-Sure was efficacious.

    - o   MVSS was not asked to perform any comparison between Onko-Sure and CEA test.

    - o   Mayo Clinic's response to Radient's January 18 press release accurately summarized the relationship between the Mayo Clinic and Radient.

    - o   Mayo Clinic denied it was involved in clinical studies with Radient.

o      MVSS was never asked to provide conclusions or opinions about Onko-Sure.

o      MVSS was not asked to provide feedback on the long term potential of Onko-Sure.

o      MVSS simply ran the specimens through an automated CEA test procedure that required no human or medical analysis, judgment or evaluation.

o      The machine automatically uploaded the test results to an Excel spreadsheet.  The CEA test results were copied and pasted to another Excel spreadsheet and provided to Radient - for Radient to analyze and evaluate.

o      The scope of the relationship between MVSS and Radient for the Onko-Sure study is set forth in the Collaboration Agreement, Change Order and Protocol.

o      The Mayo Clinic's blog post,[5] denying any substantive involvement by Mayo Clinic in the Onko-Sure study, is correct.  The blog post is the same as the quoted statements of Kathleen Anderson of the Mayo Clinic that appeared in the March 7, 2011 TheStreet.com article.

- By its plain terms, the Collaboration Agreement, Change Order and Protocol do not provide for or require any analysis, testing, review, or assessment of Onko-Sure by Mayo Clinic or MVSS.   These three

---

[5] "Mayo Clinic does have a collaboration agreement with Radient whereby Mayo Validation Support Services provided bio specimens from our Bio Specimen bank, to Radient for clinical studies. Mayo is not engaged in clinical studies with Radient and does not have a partnership agreement with Radient. The services Mayo was required to provide to Radient have been fulfilled. Any clinical study results about Onko-Sure would be provided by Radient, not Mayo Clinic."

8

agreements merely permitted MVSS to sell the blood specimens in order for Mayo, MVSS and Radient to comply with federal regulations. The fee schedules in the Collaboration Agreement and Change Order show that MVSS and Mayo Clinic's involvement was ministerial in producing the blood specimens and provided annotated samples with the CEA test results.

- The Collaboration Agreement, on its face, is a form agreement.
- Akio Ariura, a signatory of the Collaboration Agreement, testified that the Collaboration Agreement's terms were not negotiated.
- MacLellan testified in relevant part:
    o Mayo Clinic did no testing or evaluation of Onko-Sure.
    o As to the "Topline Goals" the Mayo Clinic did only those things set forth in the Collaboration Agreement, Change Order and Protocol. Yet the Collaboration Agreement, Change Order and Protocol do not set forth any duties with respect to the Topline Goals.
    o Mayo Clinic was not one of the internationally recognized leaders in oncology that purportedly took a great interest in Onko-Sure.
- Nancy Chew Plaintiffs' expert will testify in relevant part:
    o That the customer/vendor relationship between Radient on one hand, and MVSS and/or Mayo Clinic on the other hand, is common for developers of in vitro diagnostic ("IVD") products, such as Radient's Onko-Sure, as IVD developers need large numbers of samples from hospitals or medical centers to test their products.
    o That the presence of an IRB and a protocol in this case does not mean that the Mayo Clinic was conducting a clinical study of Onko-Sure.

- o An IRB was required to comply with federal laws and regulations regulating the sale of human tissue.
- o Radient exaggerated MVSS and the Mayo Clinic's involvement in the Onko-Sure study as neither MVSS, nor Mayo Clinic analyzed, reviewed, or provided any feedback about the long-term potential of, Onko-Sure.

### 2. Defendants Acted with Scienter

To prove scienter, plaintiffs must prove that a defendant acted knowingly. A defendant acts knowingly when he makes an untrue statement with the knowledge that the statement was false or with reckless disregard for whether the statement was true. A defendant acts knowingly if he omits necessary information with the knowledge that the omission would make the statement false or misleading or with reckless disregard for whether the omission would make the statement false or misleading. Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.3 (2007). According to the Ninth Circuit Model Jury Instruction, "'[r]eckless' means highly unreasonable conduct that is an extreme departure from ordinary care, presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id*.

Section 10(b)'s scienter requirement encompasses both knowing and reckless conduct. *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978). In *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990), the Ninth Circuit defined recklessness in the context of §10(b) and Rule 10b-5, stating "'[r]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of

misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id*. at 1569.

A corporation's scienter, is proven by showing scienter for its officers or directors. *Brown v. China Integrated Energy, Inc.*, 875 F.Supp.2d 1096, 1120 (C.D. Cal. 2012).

In addition to key evidence for falsity, the following evidence demonstrates that MacLellan (and thus Radient) acted with scienter in misrepresenting the true nature of Mayo Clinic and MVSS' involvement in the Onko-Sure Study:

- MacLellan testified in relevant part:
    - He was aware of the requirement that Radient obtain MVSS and Mayo Clinic's permission to use their names in any press release.
    - Dr. Small-Howard said in an email copied to MacLellan that Radient should first obtain approval from MVSS or Mayo Clinic before issuing the Press Release.
    - Dr. Motamed said in an email copied to MacLellan that she believed Radient should pay the overdue invoices to MVSS before seeking approval to issue the Press Release.
    - MacLellan did not obtain approval from MVSS or Mayo Clinic before issuing the Press Release.  Nor did Radient pay the outstanding amounts to MVSS.
    - MacLellan, nonetheless, ordered the Press Release to be issued.
    - MacLellan was aware of an earlier draft of the Press Release that made no mention of the Mayo Clinic, but still ordered the Press Release be issued without clearance from Mayo Clinic or MVSS.
    - A prior draft of the Press Release refers to the study as the "Onko-Sure trial," rather than as "the Mayo study."

- Dr. Afsaneh Motamed testified in relevant part:
  - The CEA test was a routine test run at MVSS and can be run at any large-scale laboratory. Radient outsourced the CEA test to MVSS because it did not have the machine necessary to run the CEA test.
  - The collaboration between MVSS and Radient was a "marketing tool" to increase data available to persuade doctors to use the Onko-Sure test and increase its sales.
  - MVSS was a high cost low quality provider.
- Radient's 2010 10-K and First Quarter 2011 10-Q show:
  - Before, during and after the issuance of the Press Release, Radient received a going concern qualification from its independent auditor – meaning that due to a lack of cash flow, there was substantial doubt Radient could continue s a going concern.
  - For fiscal year ended December 31, 2010, revenue was only $231,662. Radient's operating expenses for 2010 were over $14 million and its net loss for year was over $85 million.
  - During the Class Period, Radient was unprofitable and sales of Onko-Sure were minimal. For the first quarter ended March 31, 2011, Radient generated only $30,655 in revenue. Radient's operating expenses for Q1 2011 was over $1.9 million and net loss for Q1 2011 was over 11.4 million.
  - Radient had funded operations by selling debt securities and issuance of stock.
  - Radient was engaged in litigation with certain of its institutional investors and thus, it became more difficult to raise funds.
- Internal email produced by defendants show:

o MacLellan stated in an email the "Mayo study" was a "watershed" moment.

o A draft of the Press Release indicates that the Mayo's involvement is "critically important to the commercialization strategy for Onko-Sure."

o MVSS requited the services provided through the Collaboration Agreement, Change Order and Protocol be prepaid by Radient.

o Radient had been in default on its payment obligations to MVSS numerous times prior to the Press Release.

o At the time the Press Release was issued, Radient owed at least $66,396.52 to MVSS.   Radient had previously told MVSS in late December 2011 that payment would be made once an upcoming capital raise was completed.  The amounts owed to MVSS were in default. MVSS was losing patience with Radient's non-payment and was frustrated with Radient's non-payment. Samples and data were being held back until final payment.

o On January 30, 2011 Radient entered into a Securities Purchase Agreement with accredited investors raising $8,437,500 with net proceeds to Radient for $6,730,000.

o In various apology emails in the wake of the January 18th press release, Radient lied to Mayo Clinic about why the press release was issued without Mayo Clinic approval.

### 3.    Plaintiffs Satisfy the "In connection with" Requirement

It cannot be reasonably disputed that the alleged misstatements and omissions were made "in connection with the purchase or sale of security" and used the means of interstate commerce.

### 4.    Plaintiffs Can Satisfy the Reliance Element

13

Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market theory. This presumption is "'based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements....'" *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988)). Thus, this presumption of reliance "is available only when a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market," thereby establishing a "fraud on the market." *Id.*; *see also* Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.5 (2007)

In certifying the case as a class action, the Court found that Plaintiffs adequately demonstrated an efficient market, thereby invoking the fraud on the market presumption of reliance. Additionally, during the meet and confer process required by L.R. 16-2, defendants stated that they concede that Radient's stock traded in an efficient market.[6] Thus, Plaintiffs have satisfied the reliance requirement under Section 10(b).

### 5. Plaintiffs Will Prove Loss Causation

To prove causation, Plaintiffs must prove by a preponderance of the evidence that the alleged material misrepresentations or omissions were the cause of their economic injury. To establish cause, plaintiffs must prove that the alleged misrepresentation or omission played a substantial part in causing the injury or loss they suffered. Plaintiffs need not prove that the alleged misrepresentation or omission was the sole cause of their economic injuries.

---

[6] The parties will submit their joint proposed stipulated facts with the Court under separate cover.

Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.6 (2007); *Dura*, 544 U.S. at 342 (loss-causation must be established to support a §10(b) claim by showing a "causal connection between the material misrepresentation and the loss").

Plaintiffs' expert Howard J. Mulcahey performed an extensive event study demonstrating the effect of defendants' misrepresentations and omissions on the price of Radient's stock during the Class Period.  Mr. Mulcahey identified and isolated the loss caused by defendants' wrongful conduct from price declines in Radient's stock on March 7, 2011, when the truth regarding the fraud at Radient was revealed to the market. Plaintiffs will demonstrate through Mr. Mulcahey's trial testimony the connection between defendants' misstatements and omissions and the damage suffered by plaintiffs.

### 6.      Plaintiffs Can Show Economic Loss

According to the Ninth Circuit Manual Model Jury Instructions, a jury may award only actual damages, in an amount that will reasonably and fairly compensate plaintiffs for their economic loss. The award must be based on evidence and not upon speculation, guesswork or conjecture. Plaintiffs have the burden of proving damages by a preponderance of the evidence. Ninth Circuit Manual of Model Jury Instructions, Civil Instruction 18.7 (2007); *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999) ("The usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss; that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received.").

Mr. Mulcahey performed an event study to determine the out-of-pocket measure of damages caused by defendants' misconduct on a per share basis. Plaintiffs will ask the jury to determine their losses based on a per-share-basis.

### B.      Violation of Exchange Act § 20(a)

### 1.   MacLellan is Liable as a Control Person

For MacLellan to be liable under §20(a), Plaintiffs must show (i) a primary violation of the federal securities laws by Radient, and (ii) that MacLellan exercised actual power or control over Radient.  *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person 'is an intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994). "Control is present when a defendant has power to direct or cause the direction of management, as when day to day oversight of company operations is combined with involvement in the production of financial statements." *Huberman v. Tag-It Pac., Inc.*, 314 Fed. App'x 59, 62 (9th Cir. 2009); *Howard*, 228 F.3d at 1065 ("in order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power").

MacLellan can be liable for making a statement, not only for uttering or writing words, but also by being substantially involved in the preparation of the statement. Substantial involvement can include speaking, writing, editing, drafting, preparing, approving or signing a statement. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441-42 (9th Cir. 1987) ("In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the corporate officers."). During the L.R. 16-2 meet and confer, defendant MacLellan agreed to stipulate that he is a control person of Radient at all relevant times.

Thus, MacLellan will be liable under Section 20(a) if Plaintiffs prove by a preponderance of the evidence that Radient violated Section 10(b).

### IV.   RESPONSE TO AFFIRMATIVE DEFENSES

16

Defendants have collectively raised twenty one affirmative defenses in their answers.  This morning, defendant Radient informed the plaintiffs' counsel that it is only pursuing "comparative fault" and the "truth on the market affirmative defense."  Plaintiffs have not received any narrowed affirmative defenses from defendant MacLellan.

This afternoon, defendant MacLellan confirmed that he is only pursuing the "truth on the market affirmative defense."

Comparative Fault

Radient's assertion of "comparative fault," its Eighth Affirmative Defense, "Fault of Others/Contribution" (dkt. # 33, PageID: 799), appear to be Defendants reference to proportionate liability under the PSLRA, 15 U.S.C. § 78u-4(f), *et seq*.

First, to the extent MacLellan seeks to reduce liability by claiming plaintiffs are at fault, there is simply no evidence that plaintiffs are responsible for the securities laws violations here.  Additionally, Radient has never identified plaintiffs as being responsible for any part of the securities laws violations and the losses that flow from them.  Thus, Radient should be precluded from asserting that plaintiffs are in any way responsible for the securities law violations and their losses.  Indeed, that Radient has abandoned its estoppel affirmative defense is an implicit acknowledgment that plaintiffs are not responsible for the securities laws violations here.

Second, Radient should be limited to asserting this affirmative defense only as to the Mayo Clinic, TheStreet.com, and MacLellan as those are the only parties plaintiffs have received any notice of.  Radient should not be permitted to propose other persons at fault for the first time on the eve of trial; otherwise plaintiffs will suffer undue prejudice.

Truth-on-the-Market

17

Radient's "truth on the market" affirmative defense fails because the information contained in the January 18, 2011 press release contained new information that is different than information that had previously been known to the market.  *See*, *Provenz*, 102 F.3d at 1492-93 ("the defendant must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided representations."). Moreover, common sense dictates that a company's later statement, i.e. the January 18, 2011 press release, will have a greater effect on the total mix of information available to investors than statements it made months or even years before.  It is illogical to suggest that Radient's earlier statements in 2009 and August 2010 "corrected" Radient's false January 18, 2011 statements.

## V.   ANTICIPATED EVIDENTIARY ISSUES

Other than evidentiary issues Plaintiffs anticipate presenting in an omnibus motion *in limine,* Plaintiffs do not have any evidentiary issues at this time.  *In limine* motions are due October 24, 2013.

## VI.   BIFURCATION OF ISSUES

Plaintiffs do not request bifurcation of any issues for trial.

## VII.   JURY TRIAL

Plaintiffs seek a jury trial. Since plaintiffs seek only money damages, all of the issues raised in this action are triable to a jury as a matter of right. *See U.S. Const. Amend. VII* ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). Moreover, plaintiffs made a timely demand for a jury. *See* Amended Class Action Complaint For Violation of the Federal Securities Law, dkt. # 14.

## VIII.  ATTORNEY'S FEES

In the event plaintiffs prevail in this litigation, plaintiffs will tax costs and submit the appropriate papers in accordance with the standard practices of this Court in awarding costs and/or attorneys' fees in securities class actions, if and as warranted.

## IX.   ABANDONMENT OF ISSUES

None.

Plaintiffs' Memorandum of Contentions of Fact and Law
No-CV-11-0406-DOC (MLGx)

Date: October 14, 2013

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**


/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq. (pro hac vice)
Jonathan Horne, Esq. (pro hac vice)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Class Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071.  I am over the age of eighteen.

On October 14, 2013, I electronically filed the following **PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW (L.R. 16-4)** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on October 14, 2013

/s/ Laurence Rosen
Laurence M. Rosen