JS-6

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

|  |  |
|---|---|
| VINH NGUYEN,<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>RADIENT PHARMACEUTICALS CORPORATION ET AL.,<br><br>    **Defendants.** | **Case No.: SACV 11-00406 DOC(MLGx)**<br><br>**ORDER ON FINAL APPROVAL OF CLASS ACTION SETTLEMENT [132] [134]** |

Before the Court is Plaintiff's motion for approval of the final settlement in this class action (Dkt. 132) and motion for attorneys' fees and costs (Dkt. 134). The Court held a hearing on this matter on April 22, 2014, at which one objector challenged the plan of allocation. After reviewing the moving and opposing papers, considering the arguments at the hearing, and reviewing the entirety of the record, the Court GRANTS both motions.

## I.    Background

This case arises out of Plaintiffs' allegations that Defendant Radient violated Section 10(b) of the Securities and Exchange Act of 1934 (and Rule 10b-5 thereunder), and that the individual defendants violated Section 20(a) of the Exchange Act. *See* Rosen Decl. ¶ 8.  The class includes all persons who purchased Radient stock between January 18, 2011 and March 4, 2011. *Id.* ¶ 9.

Plaintiffs allege that Radient released press information mischaracterizing its relationship with the Mayo Clinic, suggesting to investors that the two were involved in a joint study.  FAC ¶ 12.  In fact, the relationship was very different. *Id.* ¶ 15.  When a news story broke claiming that these representations were false, Radient stock fell 26 percent in one day. *Id.* ¶¶ 15-16.

Plaintiffs filed the instant lawsuit on March 11, 2011. *See* Compl. (Dkt. 1).  The case was heavily litigated on both sides, progressing through motions to dismiss, expert and fact discovery, class certification, summary judgment, and pretrial preparation.  The instant settlement was reached within weeks of trial.  The Court granted preliminary approval on January 31, 2014 (Dkt. 130).

## II.    Legal Standard

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  Court approval involves a two-step process: (1) preliminary approval of the settlement; and (2) following a notice period to the class, final approval of the settlement at a fairness hearing. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  The Court may issue final approval of a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *In re Bluetooth Headset prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

Rule 23(e)'s primary concern is "the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982).  In considering final approval of a proposed settlement, the Court's discretion is guided by the following factors:

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 556, 575 (9th Cir. 2004). "This list is not exhaustive, and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). In addition to these factors, the Court may consider the procedure by which the parties arrived at the settlement to determine whether the settlement is truly the product of arm's length bargaining, rather than the product of collusion or fraud. *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).

The Court's role in evaluating the proposed settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (quoting *Officers for Justice*, 688 F.2d at 625). In evaluating a settlement agreement, it is not the Court's role to second-guess the agreement's terms. *Officers for Justice*, 688 F.2d at 625. "Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("Neither the district court not this court ha[s] the ability to delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety."). In general, however, there is a strong judicial policy favoring class settlements. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

**III.   Adequacy of Settlement**

      **i.   Strength of Plaintiffs' Case**

Plaintiffs' claims survived a motion to dismiss, class certification, and summary judgment.  It is therefore apparent that the claims were strong.  However, Plaintiffs faced several proof hurdles at trial, including scienter and the challenges of calculating damages.  Plaintiffs note that Defendants presented a colorable defense as to whether the claims about the Mayo Clinic could be considered accurate, and any claim requiring proof of an intentional mental state presents challenges.  *See* Rosen Decl. ¶ 35.  Therefore, although the claims were quite strong, there were clear factual challenges facing Plaintiffs at trial.

### ii.  Risk, Expense, Complexity

In addition to the scienter challenges discussed above, Plaintiffs faced further challenges in taking this case to trial.  Proving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law.  The outcome of that analysis is inherently difficult to predict and risky.  *See In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) *aff'd,* 798 F.2d 35 (2d Cir. 1986).  In addition to these challenges, even if Plaintiffs were to successfully achieve those results, it is apparent that Radient would likely be judgment proof beyond the settlement reached here; perhaps even more so after the heavy costs of litigation.  Rosen Decl. ¶ 38.  The Settlement therefore provides a reliable, speedy way for the plaintiff class to receive a guaranteed cash payment, a significant advantage.

### iii.  Risk of Maintaining Class Action Status

The Court certified this class on November 26, 2012 (Dkt. 65).  Plaintiffs note that this certification relied, at least in part, on expert testimony.  An upcoming Supreme Court case may reevaluate the fraud-on-the-market presumption of reliance, creating a possible basis for decertification.  Rosen Decl. ¶ 37.  The Settlement protects the class from the additional litigation that may be required, and also eliminates the risk of actual decertification.  In light of the posture of the case, however, it seems likely that the Plaintiffs could have maintained class status through trial.

### iv.  Amount Offered in Settlement

The instant settlement provides $2.5 million to the class, and represents roughly 25.8 percent of the maximum provable damages. *See* Rosen Decl. ¶ 24. This is an excellent recovery and is a higher percentage of recovery than several other approved securities fraud settlements in this Circuit. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (upholding settlement totaling about 16.66 percent of estimated loss); *In re Skilled Healthcare Group, Inc. Sec. Litig.*, No. CV 09–5416 DOC (RZx), 2011 WL 280991, at *4 (C.D. Cal. Jan.26, 2011) (approving a settlement amount of approximately twenty percent of the estimated maximum damages); *In re Omnivision Tech, Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement amount of approximately nine percent of the estimated maximum damages). The Court therefore finds that the amount of the settlement is reasonable and a good result for the class.

### v. Extent of Discovery Completed and the Stage of Proceedings

All discovery was completed at the time of the settlement. The parties went through extensive fact and expert discovery and Plaintiffs successfully opposed summary judgment. It is clear that there was ample time to evaluate all of the aspects of the case, the strength of the factual and legal questions at issue, and the likelihood of prevailing. Plaintiffs also managed to achieve substantial value from the settlement after an ongoing mediation process. This is certainly a case when both parties had a thorough sense of the options going forward and the likelihood of success at trial.

### vi. Experience and Views of Counsel

Counsel on both sides of this issue are experienced litigators. *See* Rosen Decl. ¶¶ 45-47; Fee Motion Ex. 2. Settlement negotiations also involved a distinguished retired Magistrate Judge as mediator. *See* Rosen Decl. ¶¶ 21-22. The negotiations were hard-fought and extensive, including a full day session with the mediator that informed, but did not produce, the settlement. *Id*. "[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight." *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) *aff'd,* 661 F.2d 939 (9th Cir. 1981).

### vii. Presence of a Governmental Participant

There is no governmental participant in this action.

### viii.   Reaction of Members to the Proposed Settlement

The Claims Administrator made copies of the Settlement Notice available on *GlobalNewswire*, *Investor's Business Daily*, and on the Claims Administrator's website.  Rosen Decl. ¶ 28.  The Administrator also mailed notice to 12,389 possible claimants known to be possible class members. *Id* ¶ 29.  As of this date, there has been one request for exclusion and one objection. *Id*. ¶ 30.  The objection is only to the plan of allocation, not to the settlement itself, and so will be addressed fully below.  The fact that the settlement has received no opposition from the class is valuable evidence of fairness. *Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.").  There have been no objections to the Settlement itself, and so the Court finds this factor weighs in favor of the Settlement.

### ix.   Exclusion Request

In the class notice mailed pursuant to the preliminary settlement order, requests for exclusion from the class were due on March 24, 2014.  Bravata Decl. (Rosen Decl. Ex. 1) Ex. A at 2.  The notice required that any request for exclusion include the class member's "name, address, telephone number and your signature, along with an accurate list of all of your purchases and sales of Radient Stock including the date, number of shares and price of the shares purchased or sold." *Id*. at 5.

One entity, Alpha Capital Anstalt ("Alpha"), mailed a letter to the Administrator on March 13, 2014. *Id*. Ex. D at 1.  The letter stated that Alpha requested exclusion, but did not list Alpha's purchase and sale transactions for Radient stock during the Class Period. *Id*.  The Administrator contacted Alpha's counsel to request that information and informed counsel that the exclusion request was invalid.  Supp. Bravata Decl. ¶ 4.  Counsel informed the Administrator that the information was not available and Alpha would send it when it was located. *Id*.  As of April 8, 2014, the Administrator had not received this information. *Id*.  Alpha has not filed any other notice in this matter.

The Court finds that the exclusion procedures and requirements were reasonable and clearly stated in the notice sent to class members.  Therefore, the procedurally inadequate opt-out request is DENIED.  *See Hughes v. Microsoft Corp.*, C98-1646C, 2001 WL 34089697, at *8 (W.D. Wash. Mar. 26, 2001).

### x.  Conclusion

In weighing the factors listed above, the Court finds that the settlement is fair, adequate, and reasonable.  *See* Fed. R. Civ. P. 23(e)(2).  The Court finds no evidence suggesting that the settlement is the product of fraud or overreaching by, or collusion between, the negotiating parties.  *See Rodriguez*, 563 F.3d at 965.

### IV.  Plan of Allocation

Approval of a plan of allocation of settlement proceeds in a class action under Rule 23 is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable, and adequate.  *In re Oracle Sec. Litig.*, C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) (citing *Class Plaintiffs*, 955 F.2d at 1284-85).  A settlement in a securities class action case can be reasonable if it "fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue."  *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 669 (E.D. Va. 2001).  "With respect to the formula used in a Plan, courts recognize that '[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.'"  *In re Broadcom Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 41976 (C.D. Cal. Sept. 12, 2005) (internal citations and quotation marks omitted).

The plan of allocation in this settlement uses a Recognized Loss value calculated for each share.  The Recognized Loss value depends upon when that share was purchased and sold.  *See* Bravata Decl. (Mot. Ex. 1) Ex. A at 3.  The settlement fund will be distributed on a *pro rata* basis according to each class members' Recognized Loss.  The calculation nets any gains from Class Period transactions with any losses therefrom.  The Plan does not provide monetary

recovery for shares bought during the Class Period but sold it before the Class Period closed, so-called "in and out" trades.

There is one objector to the plan of allocation, Objector Paskowitz (the "Objector").  The Objector argues that the plan is unfair because it provides no recovery for traders whose shares fall into the "in and out" category.  The Objector argues that the exclusion of the in and out traders is not reasonable because Radient's stock price began a precipitous decline before the news article that closes the Class Period.  The Objector also objects to the requested attorneys' fees, and the Court will address that objection below.  The Objector argues that these traders should be able to recover under either a "leakage" argument that pre-disclosure correction of the misrepresentation caused the stock price to fall before the actual corrective disclosure, or an "out-of-pocket" theory of loss causation.

An "out of pocket" theory relies on the idea that the in and out traders would not have purchased the stock at all except for its artificially inflated price.  In a general sense, the out-of-pocket "measure is the difference between the fair value of what was received and the fair value of what one would have received had there been no fraudulent conduct."  *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012).  In the securities context, the out-of-pocket rule calculates damages as "the difference between the purchase price and the value of the stock at the date of purchase."  *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 698 (W.D. Wash. 2010); *see Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir. 1990).

There has been some argument, however, that this Ninth Circuit rule does not survive *Dura Pharmaceuticals*, in which the Supreme Court rejected the Ninth Circuit rule that a securities fraud plaintiff could plead a claim by simply alleging that "the price *on the date of purchase* was inflated because of the misrepresentation."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005).  The Court emphasized that the defendant's misrepresentation must proximately cause the economic loss, and that, "[n]ormally, in cases such as this one (*i.e.,* fraud-on-the-market cases), an inflated purchase price will not

itself constitute or proximately cause the relevant economic loss." *Id*. at 342.  The Court noted that the fact of an initially inflated purchase price does not "inevitably" result in a later loss; that the actual cause of an investor's loss might be the misrepresentations, but could also be the result of other factors.  *Id*. at 343 ("Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.").  Subsequent Ninth Circuit case law has interpreted *Dura* to mean that, "[t]o adequately plead loss causation . . . a plaintiff must allege that the 'share price fell significantly after the truth became known.'"  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010)

      The impact of *Dura* on the *Wool* out-of-pocket rule is unclear, and has not been revisited by the Ninth Circuit.  *See Dendreon*, 267 F.R.D. at 698 (discussing post-*Dura* case law).  At this point, however, post-*Dura* authority has not interpreted the case to bar in-and-out traders from all securities fraud class actions.  Rather, circuit courts look to *Dura* for the proposition that in-and-out traders must be able to provide the requisite showing of proximate cause that is necessary for the stage of the proceedings.  *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012) ("This holding does not alter or abandon the traditional out-of-pocket measure for damages . . . .  Rather, the Court merely clarified that a securities fraud plaintiff who purchased stock at an inflated purchase price must still prove that she suffered an economic loss, and that that loss was proximately caused by defendant's misrepresentation."); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 639 (3d Cir. 2011) *abrogated on other grounds by Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ("Citing *Dura*, the [district] court recognized that persons who sold their securities before the first corrective disclosure would face a difficult task of establishing damages and therefore also of loss causation, but declined to narrow the class dates, holding this a factual question that need not be addressed at the class certification stage."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (holding that insufficient evidence existed to establish loss causation with respect to in-and-out traders at class certification stage).

It is here that the Objector's claim must fail.  The Objector points to almost no evidence in the record suggesting that the in-and-out traders had any reasonable chance of proving a leakage or out-of-pocket theory.  In his initial objection, the Objector pointed only to evidence of increased short sale activity in Radient stock.  This is at best speculative evidence that the losses experienced by the in and out traders are the result of the misrepresentation, rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura*, 544 U.S. at 343; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009) (rejecting argument that an expert's study of "industry event" established loss causation for in and out traders where the study did not demonstrate that any of the information that allegedly leaked into the market actually revealed the truth about the misrepresentations).  Plaintiffs also dispute whether the presented evidence is accurately described as "short sale activity," arguing that the data is in fact evidence of short sale interest and so less probative.  *See* Reply to Objection at 2-3.  Later, in a supplemental brief, the Objector argues that the contract between Radient and the Mayo Clinic subsidiary MVSS was filed publically on May 3, 2010, roughly eight months earlier.  Again, this evidence is speculative at best, and does not render the settlement in this case unreasonable or unfair.

Furthermore, this evidence runs contrary to the skilled judgment of counsel and the event study and analysis of forensic economist Howard Mulcahey (Plaintiffs' damages expert).  Indeed, Mr. Mulcahey's report prepared in opposition to Defendants' summary judgment motion detailed his analysis and conclusion that the March 7 news article is the relevant corrective disclosure in this case.  *See* Mulcahey Report, Opp'n to MSJ (Dkt. 76) Ex. 15 at 38-40.  These opinions were formed with the advantage of full fact and expert discovery.  The evidence the Objector presents is simply not concrete enough nor persuasive enough to convince the Court that the plan of allocation is unreasonable or unfair.

The Objector argues that any settlement that releases any claim without compensation is per se unreasonable, but the Objector's authority does not bear this out.  In *Ferrington*, the Northern District analyzed a class settlement, rather than a plan of allocation, that did not

provide relief for a group of class members whose claims the Court found sufficiently meritorious to warrant some award.  *Ferrington v. McAfee, Inc.*, 2012 U.S. Dist. LEXIS 49160, 30-32 (N.D. Cal. Apr. 6, 2012) ("[T]he claims of the downloader subclass are not so meritless that releasing the claims for no consideration is fair and reasonable.").  The case on which *Ferrington* relies further contemplates that some class members' claims may be too weak to enable distribution, but that these matters were properly for the consideration of the district court.  *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. Ill. 2004) ("[T]he district judge's duty in a class action settlement situation to estimate the litigation value of the claims of the class and determine whether the settlement is a reasonable approximation of that value.").  Even if it is theoretically possible to include in-and-out traders in a class action, this does not mean that they must always be included.  "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *Omnivision*, 559 F. Supp. 2d at 1045 (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D., 588, 596 (S.D.N.Y. 1992)).  The record shows that it is very unlikely that the in-and-out traders could have proved recoverable damages.

The Court finds that the plan of allocation is reasonable, fair, and adequate.  Two of the three class representatives held some in-and-out shares and would have benefited significantly in the *pro rata* distribution had it included those shares.  Reply to Objection at 8 (citing Dkt. 9-3). Counsel has also litigated this case thoroughly and aggressively from the start and utilized expert input to determine the extent of damage and calculation of the instant settlement.  The Court sees no reason to disagree with their judgment of their own case on this record, and finds it is highly unlikely the in-and-out traders could prove any damages caused by Radient's alleged misrepresentation.  The Objector is correct that proving in-and-out claims is not impossible, but there is no evidence that the in-and-out traders *in this case* could have done so.  On this basis, the plan of allocation reasonably does not include values for in-and-out shares.  The plan of allocation reasonably and fairly represents injuries and claims on the merits.

At the last minute, the Objector adds a brief argument that class counsel is inadequate under *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619-22 (1997).  First, the Court already

engaged in this analysis at the certification stage, and counsel did not raise this previously.

Second, the Court finds no basis to deny the settlement on the basis of inadequate

representation.  The lead plaintiffs held in-and-out shares, and so had an interest in those shares

being compensated.  Certainly their interests were no so opposed to render them in conflict with

any other class members.  The Court finds nothing in the Objector's arguments that supports

reversing the Court's earlier determination.

## V.     Attorneys' Fees

Plaintiffs' counsel seeks to recover litigation costs of $421,689.872, fees of $700,000,

and an award to the class plaintiffs of $2,000 each (a total of $6,000).  Counsel requests payment

of these amounts from the $2,500,000 Settlement Fund.

"[A] private plaintiff, or his attorney, whose efforts create, discover, increase or preserve

a fund to which others also have a claim is entitled to recover from the fund the costs of his

litigation, including attorneys' fees."  *Vincent v. Hughes Air W., Inc.,* 557 F.2d 759, 769 (9th

Cir. 1977).  "This rule, known as the 'common fund doctrine,' is designed to prevent unjust

enrichment by distributing the costs of litigation among those who benefit from the efforts of the

litigants and their counsel."  *Omnivision*, 559 F. Supp. 2d at 1046 (quoting *Paul, Johnson,*

*Alston, & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir. 1989)).  District courts have the

discretion to calculate fees by either calculating a lodestar or awarding a percentage of the

common fund.  *See, e.g.*, *Chemical Bank v. City of Seattle (In re Washington Pub. Power Supply*

*Sys. Sec. Litig.)*, 19 F.3d 1291, 1296 (9th Cir. 1994).

In common fund cases, the "benchmark" percentage award is 25 percent of the recovery

obtained, with 20 to 30 percent as the usual range.  *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290

F.3d 1043, 1047 (9th Cir. 2002).  The "benchmark" is the starting point for the analysis, and the

ultimate amount must be supported by findings that take into account all of the circumstances of

the case, including the result achieved, the risk involved in the litigation, the skill required and

quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and

the lodestar crosscheck.  *Id*. at 1048-50.  Especially in a class action, "the district court must

exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees

1    are fair and proper." *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir.

2    1999); *accord Staton v. Boeing Co.*, 327 F.3d 938, 963-64 (9th Cir. 2003).

3          There are significant benefits to the percentage approach, including consistency with

4    contingency fee calculations in the private market, aligning the lawyers' interests with achieving

5    the highest award for the class members, and reducing the burden on the courts that a complex

6    lodestar calculation requires. *See In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374-77 (N.D.

7    Cal. 1989). Further, the PSLRA states that class counsel's fees shall not exceed a "reasonable

8    percentage" of the class's recovered damages. *See* 15 U.S.C. § 78u-4(a)(6); *In re Cendant Corp.*

9    *Sec. Litig.*, 404 F.3d 173, 188 n.7 (3d Cir. 2005) ("In particular, the PSLRA has made

10   percentage-of-recovery the standard for determining whether attorneys' fees are reasonable.").

11   On this basis, the Court elects to proceed with the percentage method.

12               **i.  Benchmark**

13         The settlement agreement provides for a common fund of $2,500,000. Plaintiff's counsel

14   requests 28 percent of the Settlement Fund, or $700,000, in fees. This is within the range of the

15   benchmark in this Circuit, and only slightly above the standard benchmark. Therefore, at first

16   glance, the attorneys' fees request appears reasonable. The particular facts and circumstances of

17   this case justify a 28 percent fee award under the relevant factors. The settlement achieved very

18   good results, accounting for a large percentage of the maximum estimated loss. As noted

19   earlier, this percentage of recovery is in line with or higher than those achieved in several other

20   securities fraud class actions. By one study, it is 51 percent higher than the median settlement

21   value for similar cases. *See* Rosen Dec. Ex. 3.

22         Plaintiff's counsel took on significant risk in this case, working thoroughly and

23   enthusiastically through extensive litigation that required significant expert involvement.  The

24   Court has already addressed the particular challenges of proof and damages calculation that

25   Plaintiffs faced, as well as the quality of opposing counsel. The 28 percent fee award is also

26   appropriate given the contingent nature of payment and the risk incurred in taking on the case.

27   The fee is also commensurate with, and even slightly below, a traditional contingency fee. *Blum*

28   *v. Stenson*, 465 U.S. 886, 904 (1984) ("In tort suits, an attorney might receive one-third of

whatever amount the plaintiff recovers.").  Further, as noted below, the 28 percent calculation is below the corresponding lodestar calculation.

### 1.  Objection

The Objector argues that the 28 percent fee award is excessive.  First, the Objector argues that the percentage should be calculated not from the total settlement value, but from the net settlement value after deducting costs.  In this case, the Objector argues that a 25 percent fee award from this reduced number would be appropriate.  The Objector also disputes that the settlement reflects a successful result, as the recovery is "pennies per share," *see* Objection at 13 n.19, and the case is not complex relative to other securities class actions.

First, the Court disagrees that the appropriate method of calculating the benchmark is necessarily the net settlement after costs.  The Ninth Circuit in *Anthony* did uphold a district court's using this method, but held only that using the method was not an abuse of discretion. *Anthony v. Yahoo!, Inc.*, 376 F. App'x 775 (9th Cir. 2010) ("Moreover, the district court properly exercised its discretion in favor of the class by requiring that attorney's fees be based on the net recovery after administrative and other costs were deducted from the gross settlement fund.").  The Objector's reliance on this case as requiring calculation based on a net settlement is unfounded.  District courts in this jurisdiction frequently calculate using the net settlement amount, and the Court sees no basis to depart from this standard.  *See, e.g.*, *Weeks v. Kellogg Co.*, CV 09-08102 MMM RZX, 2013 WL 6531177 (C.D. Cal. Nov. 23, 2013); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2:10-CV-00302 MRP, 2013 WL 6577020, at *19 (C.D. Cal. Dec. 5, 2013); *McKenzie v. Fed. Exp. Corp.*, CV 10-02420 GAF PLAX, 2012 WL 2930201, at *11 (C.D. Cal. July 2, 2012).

Second, the Court disagrees that the fee award is excessive.  As noted below, the 28 percent benchmark is below the lodestar calculation.  This case proceeded to the brink of trial, requiring significant risk and expense by class counsel.  Prior mediation efforts had not yielded a settlement offer as high as the $2.5 million settlement, and so the ongoing litigation was not frivolous or in bad faith.  *See* Rosen Decl. ¶ 51.  The Court also disagrees that the case was insufficiently complex to warrant the enhanced fees.  Although securities class actions can be

much more complicated than the instant case, this case was sufficiently complex and lengthy to warrant a 28 percent benchmark. The additional expert preparation, discovery, and certification issues all support a larger fee.  And although the final valuation per share was measured in cents rather than dollars, this does not automatically render the settlement valueless.  The settlement constitutes over a quarter of the total estimated loss.  Furthermore, the First Amended Complaint alleges that the misrepresentations caused the stock to fall $0.15 per share from its price of $0.57 per share.  FAC ¶ 16.  The actual loss on each share, therefore, is not inaccurately described as "pennies per share," and the Court sees no reason to discount the clear value of the settlement simply because the shares were not worth more.

The Court therefore overrules the Objector's objections to the benchmark calculation.

### ii.  Lodestar Crosscheck

In order to ensure that attorneys' fees are reasonable, courts can cross-check the benchmark amount by applying the lodestar analysis.  *See Vizcaino*, 290 F.3d at 1050.  "[The lodestar] figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer."  *Bluetooth*, 654 F.3d at 941.

Plaintiffs' exhibits show a total of 1,441.8 hours worked on this action.  *See* Rosen Decl. Ex. 2 ¶ 5.  Plaintiffs' counsel bills partner time at $750 per hour, associate time at $325 to $550 per hour, and paralegal time at $200 to $225 per hour.  *Id*.  The bulk of the hours in this case are associate hours.  *Id*.  The total lodestar fee calculation is $788,955, and so the requested fee of $700,000 constitutes about 88 percent of the calculated lodestar.  *Id*.  There are no objections to the hours performed or the billing rates, and the Court finds these to be reasonable.  The benchmark is therefore below the lodestar, and thus this cross-check supports the Court's conclusion that the fee request is reasonable and fair.

### iii.  Conclusion

In light of the foregoing, the Court finds that the requested $700,000 fee award is a reasonable measure of fees in this case.  It reflects the challenges of this litigation, the contingent nature of the fee, the advanced stage of this litigation at the time of settlement, and

the results obtained for the class.  The requested fee is also below the lodestar cross-check amount.  The Court overrules the objections, and GRANTS the motion as to attorneys' fees.

## VI.    Legal Costs

Finally, counsel request $421,689.87 for unreimbursed expenses.  *See* Rosen Decl. Ex. 2 ¶ 7.  The vast majority of these expenses were incurred through expert opinions and testimony. *See id*.  The balance of the expenses includes court fees, discovery costs, travel costs, copying costs, mailing costs, and so forth.  In light of the length of this litigation and the importance of expert testimony, the Court finds these costs reasonably incurred and GRANTS the motion as to costs.

## VII.    Class Representative Awards

Plaintiff's counsel requests an award of $2,000 for each of the three class representatives, totaling $6,000.  It is common in class action cases to provide incentive awards to named plaintiffs. *See* 4 William B. Rubenstein et al., *Newberg on Class Actions* § 11:38 (4th ed. 2008). It is within the Court's discretion to grant such an award.  *In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d at 463.  These awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general. Awards are generally sought after a settlement or verdict has been achieved." *Rodriguez*, 563 F.3d at 958-59.

The Court finds that the awards requested in this case are reasonable and appropriate. The class representatives were diligent and very involved in this litigation in a number of ways. The representatives reviewed the complaints, oversaw and advised counsel throughout the litigation, participated in discovery, and sat for their own depositions.  Rosen Decl. ¶ 69. Although the litigation did not present any significant personal risk to the class representatives, the case was lengthy and required a significant investment of their time.  The award requested is lower than other awards approved by sister courts, and the Court finds that it properly reflects the benefits that the class representatives achieved for the class and the representatives' personal sacrifices. *See In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act*

*(FACTA) Litig.*, 295 F.R.D. 438, 472 (C.D. Cal. 2014) (approving $5,000 incentive award); *Faigman v. AT & T Mobility LLC,* No. C06–04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving incentive payment of $3,333.33 and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.,* No. CV–10–3873–JST (RZx), 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving a $3,000 award); *Hartless v. Clorox Co.,* F.R.D., 273 F.R.D. 630, 2011 WL 197542, *15 (S.D. Cal. Jan. 20, 2011) (approving an award of $4,000 to one named plaintiff and $2,000 to another).

The Court therefore GRANTS the request for incentive awards of $2,000 for lead plaintiffs Reydel Quintana, Dat Tan Tran, and Agnes Cho.

**VIII.  Disposition**

The Court GRANTS the motion for final approval of the class settlement and plan of allocation (Dkt. 132).  The objections to the plan of allocation are overruled.  The request for exclusion is denied.

The Court GRANTS the motion for attorneys' fees and costs (Dkt. 134), and awards class counsel $700,000 of the settlement fund, reimbursement of costs totaling $421,689.87.  The objections are overruled.  The Court approves awards of $2,000 for each of the lead plaintiffs in the case.


DATED:      May 6, 2014

_David O. Carter_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE